Daniel, J.
Ifi the view which I take of this case, it is not necessary to consider the general proposition in respect to the right of a party, who has been in the *66 possession of land, for a sufficient length of time to bar an entry, under an executory agreement for its purchase made with one who had himself acquired the possession under a like agreement with a third party, to set up his possession as adverse to the rights of the latter, and to resist by the plea of the statute of limitations the claim of the latter to execute his lien for an unpaid balance of purchase money due by his immediate vendee.
The state of the facts admit, in my opinion, of the application of a well-established and indeed undisputed principle, under the operation of which the defence of Erskine’s representatives and heirs, so far as it is rested on the pretension of a possession adverse to the lien of North, must fail. The principle to which I advert is the one stated by Judge Lomax in his Digest, as regulating the fourth class of cases in which an adversary possession will be negatived. The terms in which he announces the principle are, that when the possessor has acknowledged a title in the claimant, then the possession will not be deemed adverse; and wherever the act of the possessor acknowledges a right in the claimant, the statute will not operate, because such an acknowledgment deduced from circumstances, negatives the idea of adverse possession. 1 Lomax’s Digest, 2d ed. p. 625.
It is admitted that Erskine acquired possession under the title bond of Buckingham executed in 1835; and in the condition of said bond it is stipulated that so soon as Buckingham clears the lot of all incumbrances which are now on it, and makes unto Erskine a good title to said lot, Erskine is to pay Buckingham, in his debts, the sum of seven hundred dollars for said lot.
Here was an acknowledgment by Erskine that there were incumbrances on the land, and the payment by him of the purchase money (by giving Buckingham a *67 discharge of his indebtedness to Erskine to the extent of seven hundred dollars) was made dependent on Buckingham’s clearing off the incumbrances and making a good title. Erskine must be held to have known what those incumbrances were. It is a familiar rule that a purchaser stands affeoted'with notice of all that is apparent on the face of the instruments under which he claims, and of such other facts as those already-known put him on enquiry for, and as such enquiry, pursued with ordinary diligence and prudence, would bring to his knowledge. 2 Rob. Pr. 29, and cases there cited.
We must presume that, if not otherwise informed of the character and extent of the incumbrances mentioned in the title bond, he enquired for and obtained the information from Buckingham before or when he became a party to it, and accepted the stipulations contained in the condition.
Indeed, it is not denied in the answer of Erskine’s executors, that Erskine bought with such knowledge. On the contrary, they say “they suppose that at the time of the purchase of said lot the said Erskine had notice that a balance of purchase money was due to the plaintiff, which operated as an incumbrance on the land, as no title had been made.” It further appears that in the deed of trust, executed by Buckingham in September 18-30, for the security of Erskine, the lot in controversy is conveyed and is there described and identified as “the lot of ground that said Buckingham purchased from John A. North, and North purchased the said thirty-four acres from Washington McOlenachan, agreeably to the plat and survey of the said Washington McClenachan.” And in the title bond of McOlenachan to North we see -that the lot is designated <s,as lot No. 15 in the division of his (McClenachan’s) land into lots as laid down in the plat and survey thereof, añade by Josiah Sbanklin.”
*68 From these facts and considerations we can draw 110 other conclusion than that Erskine had full and information as to the state of the title, and as to all Mens and incumbrances on the property; and as there is no satisfactory proof that there were, at the date of Buckingham’s title bond to Erskine, any other incumbrances on the lot than North’s lien for the balance of the purchase money, and the deed of trust to Goshen for the benefit of Beirne (with the exception of the deed of trust before mentioned, made for the benefit of Erskine), the further conclusion is equally clear, that North’s lien was one of the incumbrances intended to be embraced by the terms “all incumbrances,” used in the condition of said bond: and hence there arises necessarily the implication of an acknowledgment by Erskine of the validity and subsistence of the lien aforesaid. The case thus falls obviously within the influence of the rule already stated, and there is nothing in a possession acquired under such circumstances on which to found the statutory bar, or the analogous defence ia a court of equity.
The presumption of a grant contended for by the appellants’ counsel in his argument, is, it seems to me, equally groundless. For whether it is sought to presume such a grant to Erskine or to Buckingham, it is obvious that the lapse of time from which to make the presumption cannot have its commencement at any point anterior to the date of the acknowledgment by Erskine of North’s lien; and the interval between that date and the date of the institution of the suit, is something short of eighteen years. From the period of Erskine’s acknowledgment of North’s lien, the latter stood, obviously, on the same ground, in equity, in respect to said lien, that he would have occupied had he been the immediate vendor of Erskine;, and if is well settled by the decisions of this court in Hanna *69 v. Wilson, 3 Gratt. 243, and other cases, that in a suit brought by a vendor against his vendee to subject the land sold to sale for the purchase money in arrear, the lien of the vendor is not affected by any lapse of time short of the period sufficient to raise the presumption of payment.
The argument in favor of presuming a grant to Erskine, labors under another insuperable difficulty: For the appellants, so far from relying on such a presumption in their answer, set up their claim in terms which exclude all idea of a grant to Erskine. They say in their answer, that Erskine was put in possession of the lot at the time of the execution of the title bond in 1835 ; and that this possession “ was held by him the said Erskine from that time down to the time of his death, and has been held by his widow ever since, claiming it wider the title bond aforesaid. Here is an admission that from the commencement of Erskine’s possession down to the date of the answer, there had been no change in the character of the possession or in the title to which it should be referred. And I apprehend that it is a well established principle that a grant will never be presumed in favor of a party who by his answer expressly or impliedly admits that no grant has been made. Roberts v. King, 10 Gratt. 184.
The only question between North and the appellants, remaining to be considered, is, Whether or not we should presume a payment of North’s debt?
And here again it seems to me obvious that we cannot look beyond the date of Buckingham’s title bond to Erskine for the period from whence to reckon the lapse of time whereon to found the presumption. The subsistence of the debt at that date is a fact which we must take to be established by the implied acknowledgment of Erskine, contained in the condition of the bond. The presumption having been repelled by an *70 acknowledgment within twenty years, the general rule would require the lapse of twenty years from the date of the acknowledgment in order to establish the presumption. And the circumstances of the case, so far from being of a character to justify us in departing from the general rule, and receiving a shorter period than twenty years as the basis of the presumption, favor, in my opinion, the opposite conclusion.
North had no lien for the payment of his debt on any property of Buckingham, other than the land in question. There is no pretence that the debt has been j>aid either by Beirne or Erskine in ease of their subsequent incumbrances. Unless, then, North has received payment from Buckingham, the inference is that the debt is yet unpaid. That he did thus obtain or could thus have obtained satisfaction of his debt, is rendered extremely improbable by the testimony in respect to Buckingham’s pecuniary condition. The testimony of McPherson, taken alone, is sufficient to show that he was insolvent in a month or two after the date of his title bond to Erskine; for it appears thereby that an execution against him, which issued from the clerk’s office of the Superior court of the county in May 1835, returnable to the July rules, was returned “ No property found liable to distress.” The testimony of the other witnesses does not, I think, conflict with this conclusion. Frazer evidently i*egai'ds him as an insolvent man for many years befoi’e he left the state. Though he succeeded in making out of his effects two several sums of money (both of which it is to be inferred from his testimony were inconsiderable in amount), the one under a distress warrant, and the other under an old execution, his testimony yet tends strongly to prove that he was not in possession of a sufficiency of unencumbered property to have satisfied North’s debt. The articles of furniture and other personal property mentioned in the de *71 position of Dunn as being in the possession of Buckingham in 1833 and in 1834, and which the witness thinks continued in his possession in 1840, are of the same character and description with those conveyed in the deeds to Erskine and Beirne; and there is no evidence to show that they were not in fact the same. This evidence is not inconsistent with that of McPherson and Frazer. Indeed, Dunn says he was much involved, and that he contracted a debt with him in part for necessary supplies, amounting to seventy dollars, which he 11 could not get pay for.”
The inability of Buckingham to pay North’s debt out of any other property than the lot in question, is thus, I think, satisfactorily established. He appears to have been unable to pay, and the presumption is, he did not pay. Not only so, but it is shown that he moved from the state, and permanently abandoned it as a residence as early as in the winter of 1841-2, only seven years after the date of this acknowledgment of the debt by Erskine. If, therefore, there had been a lapse of twenty years instead of something less than eighteen from the date of such acknowledgment to that of the institution of the suit, the rules of law applicable to the case would declare the presumption of payment to be clearly rebutted : Wood v. Deen, 1 Ired. R. 230; Daggett v. Tallman, 8 Conn. R. 168; Mann v. Manning, 12 Smeedes & Marsh. 615.
The rights of Erskine, therefore, so far as they depend on his contract with Buckingham in 1835, and possession under it, are subordinate to North’s lien.
His claim under his. deed of trust of 1830 stands upon no better footing. The deed is the conveyance of a mere equity by a party, out of possession, who had never had the possession, and who had as yet neither a right to the possession of the land nor a right to the possession of the evidences of the equitable title under which he claimed. There is no testimony *72 in the cause which tends to prove a possession by Buckingham at a period earlier than at some date in 1832. Were it necessary, to the establishment of North’s right to take precedence of the deed of trust, Prove Erskine had notice of North’s lien at the time of the execution of the deed, all the elements of the proof are to be found in the transaction itself. Erskine is presumed to have known that Buckingham had no other than an equitable title, and the deed itself refers to North as the source from which it was acquired.
Nor do I think that any sufficient reason is shown why North should not also take precedence of Beirne. Beirne’s incumbrance, like Erskine’s, is taken on a mere equity, from a party who had not yet acquired the possession or even a right to the transfer of the evidences of the equitable title of the party from whom he had purchased. Not only so; but Beirne took this deed of trust with full notice and a clear acknowledgment of North’s title. The paper of the 9th January 1827 refers to the contract between North and Buckingham ; and is an order by the latter on the former for a delivery of the title bond for the land, to Beirne, on the completion of the performance of the contract by Buckingham. In a few months thereafter, to wit, on the 24th of August 1827, Beirne obtains his deed on this same lot, and on other property, real and personal. In the deed the lot is described as “ one lot or parcel of land lying and being in the county of Greenbrier, adjacent to the town of Lewis-burg, containing thirty-four acres and some odd poles, more or less, it being the same land which John A. North purchased of George W.. McClenachan, which lot or parcel of land is designated as lot No. 15, adjoining lot No. 16, which John Mays and William Smith purchased of the aforesaid G. W. McClenachan, and which lot or parcel of land, as above described, *73 the said Buckingham purchased of the said John A. North.” Here is a plain and minute reference to the several links in the title to the land. There is no intimation in the answer of Beirpe of any change in the title or in the evidences of the title between the date of the order and that of the deed. He knew, therefore, that Buckingham had not in the mean time acquired the legal title. He knew that he was obtaining a lien on a mere equity; and he stands charged with full notice and with a plain recognition of North’s prior lien.
It is insisted, however, by the counsel of Beirne, in his argument here, that the order of the 9th of January 1827, and the qualified acceptance thereof, endorsed thereon by North, when taken together, amount to an admission by North, that all which Buckingham had then to do, in order to entitle him to a delivery of the title bond, was to complete the building of the house, and to an agreement on the part of North that he would deliver over the bond to Beirne on such completion. It cannot be denied that the papers, read without a reference to the state of things existing at the time, are susceptible of such a construction. And if it appeared that Beirne did in fact so understand the papers, and acted on that understanding, and thereby sustained loss, the argument of an estoppel on North to deny the construction contended for, would be one of great force.
Against the claim of Beirne so to construe the papers it may be fairly argued, that they referred to the contract between Buckingham and North; that on looking to that contract Beirne must have seen that Buckingham’s right to the assignment of the title bond depended not merely on his completing the building of the house, but also on his paying the two notes to Parris, in which North was the security of Buckingham ; that he must have further seen that one of those *74 notes was not in fact payable till March 1827, and could hardly have supposed that Buckingham, his embarrassed condition, had anticipated the payment, or that North w.ould surrender the title bond till it was paid; that the language used by North in his acceptance, “ As soon as Elisha Buckingham completes the work of my house' agreeably to his contract with me, I will assign the within specified title bond agreeably to my contract, to P. Beirne & Co.” was in some respects equivocal: And that fair dealing to North no less than a prudent regard to his own interests, required of Beirne that he should have enquired of North whether the notes to Parris were paid, and if not, whether it was the purpose of North to bind himself by the acceptance aforesaid to deliver over the title bond before they were paid.
On the other hand, however, it is to observed that North, as the writer of the acceptance, and as the party undertaking to be bound by it, was especially called upon to be clear and explicit. He saw that by the terms of Buckingham’s order he was required to let Beirne & Co. have the title bond as soon as Buckingham should finish the house according to the contract. If by the acceptance he did not mean to deliver the bond on the happening of that event, but only on the complete performance of the entire contract between him and Buckingham, by the payment of the notes aforesaid by the latter, it was his duty to have so qualified his acceptance, and in terms not liable to be misunderstood. According to the construction which he places on his own language, it was well calculated to mislead. And if Beirne had shown that he had been - misled by it to his injury, it seems to me that equity would have required us to visit the loss on North as the party most in fault, rather than on Beirne. But in fact, there is nothing to show, and Beirne no where asserts, that relying on the title bond as a secu *75 rity, freed from North’s debt, he had been for a moment stayed in his pursuit of other means of Buckingham to satisfy or secure his debt. His deed of trust seems to contain a sweeping conveyance of all the property then owned by Buckingham, down to the most minute articles of household and kitchen furniture. It is not pretended that he paid any thing for the order. It was taken to secure an existing debt. There is no proof that North received or was to receive any thing for the supposed surrender of his lien, or that Beirne came to any loss by supposing it to be surrendered. There is, therefore, no consideration for the agreement, on the part of North, which it is sought to construe out of the language of his acceptance.
There are, too, strong circumstances to show that, if Beirne ever understood North as intending such an admission or agreement as is now supposed by his counsel, he soon came to view the subject in a different light. For in his answer he admits that North more than once, perhaps several times told him that he held a lien on the lot for about one hundred dollars, though he does not doubt that these communications were made after the date of the deed of trust from Buckingham for his (Beirne’s) benefit, as it appears that it was not ascertained till November 1831, by the settlement between North and Buckingham, what the balance due by the latter was. Now, what is more unnatural and improbable, than that Beirne should have refrained, on these occasions (if he really then understood North’s acceptance in the light now insisted on by his counsel), from referring North to his acceptance, and insisting that it was not admissible for him then to set up such a lien in the face of his own agreement and admission : Yet, he does not aver that he denied on any one of these occasions, the justice of North’s pretension. And so far from relying in his answer on such *76 supposed agreement and admission as an estoppel, he in another part of his answer expresses a perfect willingness that an account should be taken by a commissioner of the court, to ascertain what may be still due on the several incumbrances. It is true he submits to the court whether the endorsement on the written contract of February 1826, made in the handwriting of North, and signed and sealed by Buckingham, does not operate a release and discharge of whatever lien North may have had by virtue of the said contract. The said endorsement admits, it seems to me, of no such construction as that suggested. On the contrary, whilst it ascertains the balance due by Buckingham on the settlement of the Parris notes, which North surrenders to Buckingham, it contains no-intimation of a purpose on the part of North to surrender his lien on the land for such balance. The legal effect of the transaction, as between North and Buckingham, was to substitute the sealed acknowledgment by Buckingham of the amount due North on account of his having paid the notes, in place of the notes. North, instead of holding a lien on the land for the amount appearing to be due by the notes, was .thenceforward to hold his lien only for the smaller and true amount, found due on the settlement, of which the sealed acknowledgment of Buckingham was the evidence. And as the said acknowledgment (if it might have been) has not been excepted to as evidence either by Beirne or Erskine, it may be properly referred to as proof of the true balance of debt for which North had a right, as against both of them, to execute his lien on the 17th of November 1831, the date of the acknowledgment.
It is further to be observed, that there is no evidence of any demand ever having been made by Beirne on North for the delivery of the title bond. If he really considered that he was entitled to the possession of it, *77 it is difficult to conjecture why there is an entire absence of proof, as well as of averment, on his part, of his having called for it.
The question as to any presumption, in Beirne’s favor, of a payment or satisfaction of North’s debt, or of a release of his lien, arising from lapse of time, seems to me to have been already satisfactorily answered, in effect, by what I have said in respect to the like presumption set up by Erskine. For though more than twenty years have elapsed between the date of Buckingham’s sealed acknowledgment just spoken of, and the institution of the suit, the facts of Buckingham’s insolvency and removal from the state long before any such presumption could attach, and of the absence of any other source than the land, from which North could have procured payment, are, under the influence of the authorities which I have cited, amply sufficient to repel the presumption.
The questions remaining to be disposed of are those between the appellants and Beirne.
And in comparing, in the first place, the rights of Erskine and Beirne under their respective deeds of trust, I throw out of view, as unnecessary, any enquiry as to whether Erskine, at the time of obtaining his deed, is to be held as having had notice, either actual or constructive, of Beirne’s deed. The two incumbrances 'are both upon a mere equity given by a party not in possession. And as to any benefit which Erskine’s representatives can claim from the fact that his deed was duly recorded, the same benefit is enjoyed by Beirne, as his deed was also duly recorded. If, therefore, we throw out of consideration all question of notice, the equities of the respective claimants under the two deeds would appear to be exactly equal, with the exception that Beirne’s deed was the first executed and the first recorded. This exception is, however, all sufficient to turn the scales in favor of Beirne, *78 as priority, in time, is, in such cases, according to a familiar rule, equivalent in equity to superiority of right.
And as to any questions between these two parties, growing out of the contract between Buckingham and Erskine in 1835, and the possession of the latter under it, they seem to me to have been mainly anticipated in considering the like questions between North and Erskine. And I do not think that the considerations which have been urged by the counsel of the appellants, as growing out of the transactions evidenced by the exhibits Nos. 2 and 3, filed with Beirne’s answer, can affect the result. The first of these two exhibits is a statement, under the seal of Buckingham, made the first day of July 1830, showing how the proceeds of a tract of land sold, under the deed of trust to Beirne, in November 1828, were to be applied. The transaction, from the history given of it in the statement, appears to have been in all respects fair and reasonable. Certainly there is nothing on the face of it whereon to found any suspicion of fraud on the part of Beirne. He was to apply to the credit of the debt secured by the deed of trust, the whole of the price bid for the land at the sale. Whether Buckingham would go on to complete his contract with Mays, and thus place it in his power to perfect the title, on which event the finality of the sale and the payment of the additional sum of three hundred and seven dollars by Miller, the highest bidder at the sale, depended, was a matter which Beirne could not control. Under this state of things, I know of no rule forbidding Beirne from agreeing with Buckingham that the latter should go on and finish his contract with Mays, and thus perfect the title; and that out of the whole price which Miller would then pay for the land, the one hundred and eighty-eight dollars bid by Miller at the sale, and which was all that could be obtained for the land in *79 the then condition of the title, should be credited on the bond secured by the deed; whilst the three hundred and seven dollars, the residue of the whole purchase money to be paid by Miller for an unencumbered title, should go as a credit to the other debts of Buckingham due to Beirne, and not secured by the deed.
And in any conceivable aspect of the transaction, I am wholly at a loss to conceive how Erskine or his representatives can have any grounds to complain of it, seeing that neither his deed of trust nor his contract with Buckingham was then in existence.
The other exhibit, No. 3, seems to be a statement under the seal of Buckingham, of a settlement of all matters of account between him and Beirne, subsequent to the deed of trust, and not connected with it. It is true, that on the settlement there is an item of debit of five dollars and twenty-five cents, “ amount for drawing and recording deedand as the deed provides for the payment of the expense attending the drawing, recording and certifying the deed out of the moneys arising from a sale under the deed, it is argued that if the bond secured by the deed had not been paid by the one hundred and eighty-eight dollars, it is fair to presume that it too would have been brought into the settlement. For why (it is asked) bring the trifling debt of five dollars and twenty-five cents, secured by the deed, into the settlement, and omit the six hundred and sixty-four dollars, also secured by the deed. The sum of three hundred and seven dollars, “ the amount received of Miller, after deducting one hundred and eighty-eight dollars, credited on bond secured by deed,” is the main item of credit to Buckingham ; and as by the agreement evidenced by the sealed paper of the 1st July 1830, the three hundred and seven dollars were to be applied to the discharge of the debts not secured by the deed, the fair explanation, I think, is, that the true object of the settlement was *80 to show how Beirne had disposed of the three hundred and seven dollars. After charging Buckingham with the debts not secured by the deed, there would have been a small balance of five dollars and ninety-nine cents due to him. The expenses of drawing and recording the deed were in all probability not paid by Beirne till after the deed was recorded; and when he paid them, he no doubt charged them to Buckingham as an item of debit against the three hundred and seven dollars. Having paid them, there was no legal necessity for his waiting till a sale should take place under the deed. Buckingham, if he could have objected, did not object to Beirne’s retaining them out of the small balance in his hands. By retaining them, the trifling balance of seventy-four cents was left due to Buckingham on the settlement.
To bring the bond into the settlement; and to go into a calculation of interest, apply the credits, &c. was a matter foreign to the main object of the settlement. Besides, the language used both in the sealed instrument and in the settlement, in respect to the one hundred and eighty-eight dollars, repels the idea that the bond would be or had been paid in full, by the one hundred and eighty-eight dollars. In the former, it is required that it should be “ placed as a credit” on the debt secured by the deed; and in the latter, it is stated that it was so applied.
And again: the argument, of a payment in full of the bond, is strongly repelled by the consideration that if such had been the fact, the bond ought to have been in the possession of Buckingham. Yet Beirne continues to hold it, and files it and its endorsements, with his answer, as an exhibit in the cause.
Upon the whole, I see nothing in the papers referred to, to weaken the implication of an acknowledgment by Erskine, in his contract of 1835 with Buckingham, that Beirne’s debt was one of the in *81 cumbrances to be cleared off by Buckingham, or to affect the bearing and influence of such acknowledgment on the rights of Erskine sought to be founded on his possession under said contract. The defences which Erskine seeks to raise out of his possession, as against Beirne, are the same with those relied on in his controversy with North. And I am of the opinion that the facts and course of reasoning which led to the conclusion that those defences could not prevail against North, apply sufficiently to the case as between Erskine and Beirne, to show that they ought not to prevail against Beirne.
And, on the question of a presumption of payment, it is to be observed that Beirne has the advantage of the additional fact that the trustee (Goshen) in the deed of trust for Beirne’s benefit, moved from the state as early as in the fall of 1842.
The only proof of any sale under the deed, is that furnished by Beirne in the exhibits Nos. 2 and 3, and in his endorsement on the bond of a credit of the net proceeds of such sale. And the only proof of any further payment on the bond, is also furnished by Beirne, in a further endorsement on the bond. To these proofs, the commissioner, I think, properly referred as the basis of his statement of the balance due to Beirne.
It seems to me that the decree is right in all respects, and ought to be affirmed.
The other judges concurred in the opinion of Daniel, J.
Decree affirmed.