

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-16-1994

# Presbytery of NJ v. Florio, et al.

Precedential or Non-Precedential:

Docket 93-5559

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Presbytery of NJ v. Florio, et al." (1994). *1994 Decisions.* Paper 191.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/191

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 93-5559

————

THE PRESBYTERY OF NEW JERSEY OF THE ORTHODOX
PRESBYTERIAN CHURCH, a New Jersey corporation;
CALVARY ORTHODOX PRESBYTERIAN CHURCH OF WILDWOOD,
a New Jersey corporation; REV. DAVID B. CUMMINGS
Appellants

v.

JAMES FLORIO, GOVERNOR OF NEW JERSEY, in his
official capacity; ROBERT J. DEL TUFO, ATTORNEY
GENERAL OF NEW JERSEY, in his official capacity;
MARILYN FLANZBAUM; ROMAN ANGEL; BETTY CARSON; OLGA L.
VAZQUEZ-CLOUGH; FELTON LINGO, SR.; REINHOLD W.
SMYCZEK; CASEY TAM, all in their official
capacities as members of THE DIVISION ON CIVIL RIGHTS;
C. GREGORY STEWART, in his official capacity as
executive of THE DIVISION ON CIVIL RIGHTS; JOHN DOE(S);
JANE DOE(S), addresses unknown, the last two being
fictitious names, the real names of said defendants
being presently unknown or known only in part to
plaintiffs, said fictitious names being intended
to designate organizations, persons and others
acting in concert with any of the defendants who
engage in, are engaged in, or who intend to engage
in, the conduct of defendants complained of herein,
or who would have the right to file or seek enforcement
of administrative, equitable or legal complaints or
suits or to assert any other legal claims or remedies
or enforcement thereof against the plaintiffs under
the New Jersey Law Against Discrimination, as amended
by the 1992 affectional and sexual orientation
amendments, and all others similarly situated,
Appellees

————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 92-cv-01641)

————

Argued: March 25, 1994

PRESENT: HUTCHINSON, ROTH and ROSENN, <u>Circuit Judges</u>

(Filed November 16, 1994)

Thomas Stephen Neuberger, Esquire     (Argued)
Suite 702
Ninth Street Plaza
200 West Ninth Street
Wilmington, DE     19801-1646

        and

James J. Knicely, Esquire
Knicely & Cotorceanu
Suite 2
487 McLaws Circle
Williamsburg, VA     23185
            Attorneys for Appellants

Fred Devesa, Esquire
  Acting Attorney General of New Jersey
Andrea M. Silkowitz, Esquire
  Assistant Attorney General
William H. Lorentz, Esquire          (Argued)
  Deputy Attorney General
Charles S. Cohen, Esquire
  Deputy Attorney General
Office of Attorney General of New Jersey
124 Halsey Street
P.O. Box 45029
Newark, NJ     07101
            Attorneys for Appellees

David L. Grove, Esquire
Montgomery, McCracken, Walker & Rhoads
20th Floor
Three Parkway
Philadelphia, PA     19102

        and

Richard S. Hyland, Esquire
Louis A. Petroni, Esquire
Montgomery, McCracken, Walker & Rhoads
Suite 2C
1010 Kings Highway South
Cherry Hill, NJ    08034

        and

Eric J. Graninger, Esquire
Presbyterian Church (U.S.A.)
Associate General Counsel
100 Witherspoon Street
Louisville, KY    40202

                    Attorneys for Amici Curiae James E. Andrews, as
                    Stated Clerk of the Presbyterian Church (U.S.A.)
                    General Assembly, The Diocesan Council of the
                    Episcopal Diocese of Newark, John S. Spong, Bishop
                    of the Episcopal Diocese of Newark, The Lutheran
                    Office of Governmental Ministry in New Jersey, The
                    New Jersey-West Hudson Valley Council of the Union
                    of American Hebrew Congregations, New Jersey Synod
                    Council of the New Jersey Synod, Evangelical
                    Lutheran Church in America, New Jersey Council of
                    Churches, United Church of Christ Office for
                    Church in Society

Lewis H. Robertson, Esquire
Evans, Osborne & Kreizman
P.O. Box BB
Red Bank, NJ    07701
                    Attorney for Amicus Curiae ACLU NJ


                        _____

                    OPINION OF THE COURT
                        _____



HUTCHINSON, Circuit Judge.


        Appellants, the Presbytery of New Jersey of the

Orthodox Presbyterian Church ("Presbytery"), the Calvary Orthodox

Presbyterian Church of Wildwood ("Calvary") and Reverend David B.

Cummings ("Cummings"), a clergyman of the Orthodox Presbyterian denomination (collectively "plaintiffs"), appeal an order of the district court dismissing their complaint.[1]  Plaintiffs assert recent amendments to the New Jersey Law Against Discrimination (the "LAD" or "Act"), N.J. Stat. Ann. §§ 10:5-1 to 10:5-42 (West 1993 & Supp. 1994), violate the First Amendment right to freedom of speech.  The amendments they question added to the category of impermissible distinctions "affectional or sexual orientation" to the statute's ban on certain forms of discrimination.  Relying on a responsible state official's affidavit that the state would not enforce the LAD against Calvary or Presbytery as churches or Cummings as a church pastor, the district court held that the case was not ripe.

We conclude, however, that the controversy is ripe because Cummings arguably alleges the statute threatens his right as an individual citizen to speak out against male and female homosexual acts and the state has expressly refused to offer any assurance it will not prosecute Cummings if he does so outside his church.  The same, however, is not true of the institutional church plaintiffs, Presbytery and Calvary.  Accordingly, we will reverse the district court's order and remand for further proceedings consistent with this opinion in so far as its order

---

[1].  The caption in this case lists James Florio as the Governor of New Jersey.  After it was filed, Christine Todd Whitman was elected to that office, but there has not yet been a substitution of parties.  The failure to amend the caption in this respect does not affect this appeal. See Fed. R. Civ. P. 25(d)(1).  We note the change for purposes of clarification only.

applies to Reverend Cummings.  We will, however affirm the district court's dismissal without prejudice of this action as it pertains to the institutional plaintiffs.

I.

In April 1992, the plaintiffs brought this suit to enjoin enforcement of recent amendments to the LAD which had added "affectional or sexual orientation" to the personal traits or characteristics generally protected against discrimination in public accommodations,[2] employment and housing.  See N.J. Stat. Ann. §§ 10:5-4, 10:5-12 (West Supp. 1994).  The statute also prohibits "aid[ing], abet[ting], incit[ing], compel[ing] or coerc[ing]" others into violations of its prohibitions against discrimination.  N.J. Stat. Ann. § 10:5-12(e); see N.J. Stat. Ann. § 10:5-12(n).  The plaintiffs originally challenged these and other provisions as an infringement on the First Amendment right to the free exercise of religion and association as well as the right to freedom of speech.  On May 15, 1992, they filed a motion for a preliminary injunction and on May 22, filed an amended complaint.  On June 11, 1992, the state filed a motion for summary judgment along with a motion for dismissal.  The district court heard oral argument but denied the motion for a preliminary injunction holding that the plaintiffs failed to

_____

[2].  Public accommodations are defined quite broadly in N.J. Stat. Ann. § 10:5-5(l).  They include, but are not limited to, taverns, hotels, trailer camps, day camps, health facilities, stores and other retail establishments, restaurants, public conveyances, movie theaters, pool halls, schools, etc.  See id.

establish both a likelihood of success on the merits and irreparable harm. The plaintiffs appealed to this Court and on December 14, 1992, we affirmed the district court in an unpublished memorandum opinion. Presbytery of New Jersey v. Florio, No. 92-5339, slip. op. at 13 (3d Cir. Dec. 14, 1992) ("Presbytery I"), see 983 F.2d 1052 (3d Cir. 1992) (Table). Because of the state's affidavit stating its intention not to enforce the Act against religious institutions, we held that the plaintiffs failed to demonstrate the possibility of immediate and irreparable harm. Id. at 9-10. We also held that the possibility of private enforcement of the Act by activist homosexual groups was too remote to constitute an immediate threat of potential harm and, in any event, the private parties would not be bound by the injunction sought. Id. at 10-12. We specifically refused to comment on the district court's discussion of the plaintiffs' likelihood of success on the merits. Id. at 13.

Following our decision, the district court heard argument on the state's Rule 12(b)(1) motion to dismiss. The state argued that the plaintiffs lacked standing, the case was not ripe and that the federal court should abstain under Railroad Commission of Texas v. Pullman, 312 U.S. 496 (1941). The district court granted the state's motion and dismissed the complaint. Presbytery of New Jersey v. Florio, 830 F. Supp. 241 (D.N.J. 1993) ("Presbytery II"). It held that the case was not ripe, based on the state's affidavit that it would not enforce the Act against the institutional plaintiffs as churches or

Cummings in his capacity as a clergyman of the Orthodox Presbyterian Church.  Id. at 248-50.[3]  The plaintiffs filed a timely notice of appeal.

## II.

The LAD, originally enacted in 1945, prohibits discrimination in employment, labor organization membership, public accommodations and real estate, financial, and business transactions.  In 1991, the New Jersey legislature added "affectional or sexual orientation" to the personal characteristics of race, creed, color, national origin, ancestry, age, sex, and marital status previously protected.[4]  Under the

---

[3].  The court did not reach the issue of standing or Pullman abstention.

[4].  The legislature's finding and declaration states:

> The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of . . . affectional or sexual orientation . . . [is a] matter[] of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State . . . .
>
> . . .
>
> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. . . .  The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.

Act, it is unlawful for an employer "to refuse to hire or employ or to bar or to discharge or require to retire" any individual on the basis of a protected characteristic. Id. § 10:5-12(a). The Act also prohibits the printing or circulating of any statement which expresses, directly or indirectly, that employment opportunities for persons with the protected characteristics will be limited. Id. § 10:5-12(c). Public accommodations are similarly restrained. See id. § 10:5-12(f). In addition, the LAD makes it illegal for any individual to refuse to transact business with individual groups who have any of the protected characteristics. Id. §§ 10:5-12(l), (m). The Act also makes it illegal "to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." Id. § 10:5-12(e). Still another section applying the Act's prohibition against aiding, abetting, inciting or coercing violations of subsection (l) and (m) specifically prohibits incitements to boycott persons who belong to the protected groups. Id. § 10:5-12(n)(2). Finally, the Act requires owners of public accommodations and employers to post public notices informing employees and patrons of their rights under the Act. Id. § 10:5-12(j).

The Act exempts religious organizations from compliance in the selection of their own employees and it permits religious organizations to restrict rental or use of their own property to

(..continued)

N.J. Stat. Ann. § 10:5-3 (West Supp. 1994).

members of their own faith.  Id. §§ 10:5-12(a), 10:5-5(n).  The Act does not apply to private clubs or facilities for religious education.  Id. § 10:5-5(l).

The state itself may enforce the Act's civil penalties against violators.  An aggrieved individual may begin the process of civil enforcement by filing a complaint with the state Division on Civil Rights ("DCR") or proceeding directly to state court.  Id. § 10:5-13 (West 1993).  The Act specifically grants standing to sue to "[a]ny individual who has been discriminated against" and "any organization which represents or acts to further the interests of individuals who have been discriminated against."  Id. § 10:5-38 (West 1993).  The successful plaintiff may recover compensatory and punitive damages, fines, and attorney fees.  Id. § 10:5-3; id. § 10:5-14.1a (West 1993); id. § 10:5-27.1 (West 1993).  The Act is to be liberally construed to accomplish its purpose of eradicating the kinds of discrimination it prohibits.  See id. § 10:5-3.

The Orthodox Presbyterian Church ("OPC") is a national denomination with 170 member churches, including Calvary.  The OPC split from the Presbyterian Church (U.S.A.) in 1936 over a doctrinal difference.[5]  Presbytery is a New Jersey religious corporation and the formal governing body of OPC churches in New

---

[5].  The Presbyterian Church (U.S.A.) as well as a number of other mainstream organized religions have filed a joint amicus brief setting out their opposition to OPC's doctrinal views and teachings.  These amici support the state's position on the merits of this case.  Because we are only concerned with jurisdiction on this appeal we do not decide the merits.

Jersey.  At the time plaintiffs initially filed their complaint, the OPC had 2,113 members in New Jersey.

In their complaint, the plaintiffs allege the following.  Based upon The Holy Bible and church doctrine, the OPC teaches that homosexuality, bisexuality, and heterosexual sex outside of marriage are grievous sins.  Plaintiffs also allege that they

> have always in the past, presently do and since the 1992 amendments, have directly or indirectly discriminated against and made reasonable distinctions based upon homosexuality, bisexuality and heterosexual sex outside of marriage.  For example, in New Jersey the plaintiffs express, speak and preach against homosexuality, adultery and fornication, calling it variously an abomination and sinful. . . .  They also disseminate and circulate such speech and distinctions throughout New Jersey and the world. . . .  [T]hey even print and disseminate materials condemning sexual sins. . . .  Plaintiffs, and their members, also inquire about the sexual practices of prospective employees and are continuing to do so despite the existence of the 1992 amendments.

Complaint ¶ 49, Appellants' Appendix ("App.") at 217.  Cummings and members of his congregation "speak out about homosexuality, bisexuality and heterosexual sex outside of marriage, make reasonable distinctions based on such practices, lobby against them, and circulate literature condemning them.  They encourage, aid and abet discrimination and reasonable distinctions against homosexuals, bisexuals and heterosexuals engaging in sex outside of marriage."  Id. ¶ 51, App. at 217-18.  Furthermore,

"[p]laintiffs have always in the past, presently do and since the amendments have refused to knowingly buy from, contract with or otherwise do business with persons on the basis of that person's homosexual, bisexual or heterosexual practices." Id. ¶ 57, App. at 220.  Plaintiffs also "have always in the past, presently do and since the amendments have refused to employ any individual who is practicing any public sexual sin, including fornication, adultery and homosexuality, and they make reasonable distinctions based on such acts." Id. ¶ 69, App. at 223.

Initially, plaintiffs contended that various elements of the Act violated their First, Fifth, Ninth and Fourteenth Amendment rights.  The allegedly offending sections included: sections 10:5-12(a) and (c) (applicable to employers); section 10:5-12(f) (applicable to public accommodations); sections 10:5-12(e) and (n) (prohibition against aiding, abetting, or inciting violations); section 10:5-12(j) (notice posting provision); and sections 10:5-12(l) and (m) (prohibition of boycotts and refusal to do business).

In response to plaintiffs' initial request for a preliminary injunction, the Director of the DCR, C. Gregory Stewart, filed an affidavit setting forth the DCR's and attorney general's position on enforcement of the Act against religious institutions.  The Stewart affidavit averred that the state did not consider churches places of "public accommodations."  Thus, the sections relating to public accommodations were inapplicable to the institutional plaintiffs.  Stewart further stated that

churches were considered exempt in their hiring of internal employees. Due to "First Amendment concerns,"

> the Division has not in the past prosecuted and has no intention to prosecute [under sections 10:5-12(c), (e), (f), (j), (l) & (m)] essentially exempt churches for sincerely-held religious belief or practice, or speech consistent with such belief, or for a refusal to engage in certain speech or for following their religious tenets . . . . Hence, the Division would not even attempt to enforce those provisions in the circumstances of sincerely-held religious reasons such as plaintiffs express here. . . .

App. at 296. Stewart also made the following general statement:

> [I]t has been the consistent construction and interpretation of the LAD that, consonant with constitutional legal barriers respecting legitimate belief and free exercise protected by the First Amendment, the State was not authorized to regulate or control religious worship, beliefs, governance, practice or liturgical norms, even where ostensibly or colorably at odds with any of the LAD prohibited categories of discrimination.

> . . .

> Moreover, the Division has not and has no intention to engage in any determination or judgment as to what is or is not a "religious activity" of a church, or to determine what is or is not a "tenet" of religious faith. Within First Amendment limits, all of plaintiffs' claimed religiously-based free exercises of faith are unthreatened by a reasoned construction of the LAD consistent with its meaning and long enforcement history.

App. at 294-96. The affidavit did not, however, disavow enforcement against the members of the church for their public

activities nor does it preclude enforcement against Cummings for his activities outside the Church.

In light of the Stewart affidavit and our prior decision in Presbytery I, the parties agree that the scope of their challenge on the merits to the Act has been significantly limited. The plaintiffs now challenge only section 10:5-12(e), which makes it illegal "to aid, abet, incite, compel or coerce" forbidden acts, section 10:5-12(n), which makes it illegal "to aid, abet, incite, compel, coerce or induce" boycotts or refusals to do business and section 10:5-12(j), the notice posting provision. Presbytery II, 830 F. Supp. at 247; Brief of Appellants at 6. Plaintiffs argue that the first two sections are impermissible restrictions on freedom of speech and the last provision is a violation of the freedom of conscience and forced speech. Before the district court, however, the plaintiffs conceded that in light of the representations of the DCR, the sections have no applicability to the institutional plaintiffs Presbytery and Calvary. Id.

III.

If this case is ripe, and if any of the plaintiffs have standing to assert their free speech claim, the district court would have subject matter jurisdiction under 28 U.S.C.A. §§ 1331, 1343 (West 1993) and 28 U.S.C.A. §§ 2201, 2202 (West 1994). The state contends, however, that the district court lacked jurisdiction because the plaintiffs did not present an Article III justiciable controversy. The district court agreed

and dismissed the case on this ground.  Because the district court did not reach the merits of the plaintiffs' claim, the dismissal was without prejudice.[6]  The district court's order is, however, a final resolution of the plaintiffs' claims and therefore we have appellate jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 1993).

Our review of ripeness and standing determinations is plenary.  Taylor Inv. Ltd. v. Upper Darby Township, 983 F.2d 1285, 1289 (3d Cir.), cert. denied, 114 S. Ct. 304 (1993); Roe v. Operation Rescue, 919 F.2d 857, 863 (3d Cir. 1990).


IV.

The issue on this appeal is whether the plaintiffs have presented a ripe controversy so that an Article III court may assert jurisdiction.  We examine the merits of the claim only to the extent necessary to determine whether there is any potential for immediacy of harm.

Federal courts may only resolve actual "cases" and "controversies."  See U.S. Const. art. III, § 2.  The existence of a case and controversy is a prerequisite to all federal

_____

[6]. Generally, when a district court dismisses a case without prejudice, it is not a final order unless the party seeking appeal has specifically elected to stand on the complaint as set forth.  See generally Borelli v. City of Reading, 532 F.2d 950, 951-52 (3d Cir. 1976) (per curiam).  In a case such as this where the district court has dismissed based on justiciability and it appears that the plaintiffs could do nothing to cure their complaint, the principle of Borelli does not apply.  Cf. Green v. Humphrey Elevator and Truck Co., 816 F.2d 877, 878 n.4 (3d Cir. 1987) (dismissal without prejudice does not destroy finality where party cannot cure defect).

actions, including those for declaratory or injunctive relief. See Cardinal Chem. Co. v. Morton Int'l, Inc., 113 S. Ct. 1967, 1974 (1993); Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950). "Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so. We presume that federal courts lack jurisdiction 'unless "the contrary appears affirmatively from the record."'" Renne v. Geary, 501 U.S. 312, 316 (1991) (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986) (quoting King Bridge Co. v. Otoe County, 120 U.S. 225, 226 (1887))).

The concepts of standing and ripeness are related. Each is a component of the Constitution's limitation of the judicial power to real cases and controversies. Correct analysis in terms of ripeness tells us when a proper party may bring an action and analysis in terms of standing tells us who may bring the action. See Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 411 & nn. 12-13 (3d Cir. 1992); see also Erwin Chemerinsky, Federal Jurisdiction 99 (1989) ("standing focuses on whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether that injury has occurred yet"). Because these concepts are so closely related, they can be confused or conflated. "It is sometimes argued that standing is about who can sue while ripeness is about when they can sue, though it is of course true that if no injury has occurred, the plaintiff can be told either that she cannot sue, or that she cannot sue yet." Smith v.

<u>Wisconsin Dep't of Agriculture, Trade & Consumer Protection</u>, 23 F.3d 1134, 1141 (7th Cir. 1994) (emphasis in original). It is the plaintiff's responsibility to allege facts that invoke the court's jurisdiction. <u>Renne</u>, 501 U.S. at 316.

The district court did not reach the issue of standing but focused on whether any of the plaintiffs presented a ripe controversy.[7] Ripeness prevents courts from "entangling themselves in abstract disagreements." <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 148 (1967). "[R]uling on federal constitutional matters in advance of the necessity of deciding them [is to be avoided], to postpone judicial review where it would be premature." <u>Armstrong</u>, 961 F.2d at 413. The ripeness determination "evaluate[s] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." <u>Abbott Labs.</u>, 387 U.S. at 149. Ultimately, the case must involve "'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" <u>North Carolina v. Rice</u>, 404 U.S. 244, 246 (1971) (quotation omitted). "A federal court's jurisdiction therefore can be

---

[7]. The district court did opine, however, that "even if the Church's members were parties, nothing in the record indicates any realistic threat that the state will enforce the amendments against them." <u>Presbytery II</u>, 830 F. Supp. at 249. That conclusion is open to doubt considering the state's refusal to negate in its affidavit an intention to enforce the statute against members of the Orthodox Presbyterian denomination in their secular activities.

invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .'" Warth v. Seldin, 422 U.S. 490, 499 (1975) (citation omitted).

As Professor Chemerinsky recognizes, "[r]ipeness properly should be understood as involving the question of when may a party seek preenforcement review of a statute or regulation." Chemerinsky, supra, at 100 (emphasis in original). Thus, it is not surprising that the ripeness inquiry often involves declaratory actions which present special problems. See Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270 273 (1941) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

We have adopted a three part test in determining whether we will engage in preenforcement review in the context of a declaratory action; specifically, we examine "the adversity of the interest of the parties, the conclusiveness of the judicial judgment and the practical help, or utility, of that judgment." Step-Saver Data Sys., Inc. v. Wyse Tech., 912 F.2d 643, 647 (3d Cir. 1990); see also Armstrong, 961 F.2d. at 412-24 (applying test while noting that factors are not exclusive).

On the first part, adversity of interest, we have observed, "'[f]or there to be an actual controversy[,] the defendant must be so situated that the parties have adverse legal

interests.'" Step-Saver, 912 F.2d at 648 (quoting 10A Charles Wright, Arthur Miller & Mary Kane, Federal Practice and Procedure § 2757, at 582-83 (2d ed. 1983)). Although the party seeking review need not have suffered a "completed harm" to establish adversity of interest, Armstrong, 961 F.2d at 412, it is necessary that there be a substantial threat of real harm and that the threat "must remain 'real and immediate' throughout the course of the litigation." Salvation Army v. Department of Community Affairs, 919 F.2d 183, 192 (3d Cir. 1990). Thus, where intervening events remove the possibility of harm, "the court must not address the now-speculative controversy." Id.; see also Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983) (threatened injury must be "certainly impending").

Second, the parties must not only retain adverse interests throughout the litigation, but "[a]ny contest must be based on a 'real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" Step-Saver, 912 F.2d at 649 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937)). "A declaratory judgment granted in the absence of a concrete set of facts would itself be a 'contingency,' and applying it to actual controversies which subsequently arise would be an 'exercise in futility.'" Armstrong, 961 F.2d at 412 (quoting Step-Saver, 912 F.2d at 648). The requirement of concreteness has some play in the joints. We have noted, "the

need for a concrete set of facts is greater in some instances than others."  Id.  For example, an "actual factual setting" is "particularly important in cases raising allegations of an unconstitutional taking," id. (quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 294-95 (1981)), whereas facts are not so important where the question is "predominantly legal."  Id. (quoting Pacific Gas & Elec. Co., 461 U.S. at 201).

The third part of the test, utility of the judgment, is important because "[o]ne of the primary purposes behind the Declaratory Judgment Act was to enable plaintiffs to preserve the status quo . . ., and a case should not be considered justiciable unless 'the court is convinced that [by its action] a useful purpose will be served.'"  Step-Saver, 912 F.2d at 649 (quoting E. Borchard, Declaratory Judgments 29, 58 (1941)).  Thus, with these three inquiries in mind, we turn to an analysis of whether the district court erred by determining this case did not present a ripe controversy.

### 1.  Adversity of interest

In Armstrong we said, "[w]here the plaintiff's action is based on a contingency, it is unlikely that the parties' interest will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III."  Armstrong, 961 F.2d at 411-12.  In concluding that the instant case was not ripe for adjudication, the district court relied in large part on the representations of the DCR through the Stewart affidavit and a history of the LAD's non-enforcement against religiously

motivated speakers.  Thus, in terms of the Step-Saver test, the

district court determined that the parties had no adverse

interest.  Despite Cummings' assertion that he has engaged, does

engage and will engage in prohibited discrimination, the court

stated:

> [N]o enforcement action or private suit has
> been commenced against [Cummings or the other
> plaintiffs] as a result.  Moreover, although
> Plaintiffs allege that they intend to engage
> in similar conduct in the future, without an
> actual or imminent threat of enforcement of
> the statute the constitutional issues are not
> presented in a sufficiently "'clean-cut and
> concrete form'" to render this action ripe.'"
> See [Renne], 111 S. Ct. at 2339.
>
> Plaintiffs argue that this case is ripe
> because, although Defendants have conceded
> that they will not enforce the LAD against
> the institutional plaintiffs, they have not
> waived enforcement of the statute against
> Cummings or against the Church's individual
> members.  The Court, however, disagrees with
> Plaintiffs' interpretation of Defendants'
> waiver as not including a waiver of
> enforcement against Cummings.  The
> Defendants, recognizing the First Amendment
> concerns raised in this action, have
> represented that the LAD does not apply to
> and will not be enforced against Plaintiffs'
> religious worship, beliefs, practice, speech
> or refusal to speak.  See Stewart Aff.,
> ¶¶ 10-13.  This Court reads these statements
> as clearly including Plaintiff Cummings.
> Accordingly, the Court sees no possibility of
> state enforcement against him.

Presbytery II, 830 F. Supp. at 248-49.

The state argues that the district court correctly held

that none of the named plaintiffs face an imminent threat that

the LAD's prohibitions against incitement or otherwise inducing

or helping others to induce boycotts, any of its other prohibitions against discrimination or its notice posting requirement will be enforced against them. In support, the state contends that the complaint and its allegations refer to Cummings only in his capacity as pastor of an Orthodox Presbyterian Church. Because it has waived enforcement against the plaintiffs when they act in their capacity as religious organizations or as clergymen performing religious functions, the state concludes that Cummings does not face any imminent threat of enforcement, but yet refuses to guarantee that he will not be prosecuted if he acts as an individual outside the church.

Applying the usual standards for construing the allegations of a complaint which give the plaintiff the benefit of all favorable inferences that can be drawn from them,[8] we conclude that the complaint fairly asserts Reverend Cummings' rights as both a pastor and a citizen and therefore that the Stewart affidavit is insufficient to remove the threat of enforcement against Cummings in his individual capacity.

In order to determine what rights Cummings asserts, we turn to the amended complaint. Complaints need not be models of precise information. Rather, a complaint suffices when it serves fairly to notify the defendants of the facts and the alleged deprivation. See, e.g., Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993). Moreover, when judged on their face,

---

[8]. See Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990).

complaints should be construed in favor of the party defending against a motion to dismiss. Cf. id. ("The test in reviewing a motion to dismiss for failure to state a claim is whether, under any reasonable reading of the pleadings, plaintiff may be entitled to relief.") (citing Colburn v. Upper Darby Township, 838 F.2d 663, 665-66 (3d Cir. 1988), cert. denied, 489 U.S. 1065 (1989)); Williams v. New Castle County, 970 F.2d 1260, 1266 (3d Cir. 1992).

The state contends that the complaint asserts Cummings' rights only in terms of his institutional capacity. A careful review of the record, however, reveals a different conclusion. Although it is helpful for a complaint to specify if a party is bringing suit in his individual or official capacity, we are not aware of any rigid rule that requires an express statement of such capacity. We recognize that Cummings is listed as the "Rev. David B. Cummings" in the caption of the complaint, App. at 195, but his participation is nowhere limited to his institutional capacity.[9] Again, in paragraph 4 of the complaint, Cummings is identified as being an ordained minister of the Presbytery, the pastor of one of its New Jersey churches and a plaintiff, but no

---

[9]. Use of the term "Reverend" in written documents is generally a respectful acknowledgment of the clergyman's calling or profession. In the same way persons in other professions are respectfully addressed as "doctor," "attorney," "professor," etc. At oral argument, appellants' counsel stated he listed Cummings as the "Rev. David B. Cummings" in the caption "because that is his title." Transcript of Oral Argument, March 25, 1994 ("Tr.") at 5. He also indicated that if a pastor is suing in an official capacity he normally would add "as pastor of such and such" in the caption. Id.

mention is made of his suing only as a leader of an institution. In paragraph 14, Cummings is described without limitation to his capacity as a clergyman or religious leader. In paragraph 51, the complaint states:

> Plaintiff Cummings, other pastors and members of their congregations . . . do speak out about homosexuality, bisexuality and heterosexual sex outside of marriage, make reasonable distinctions based on such practices, lobby against them, and circulate literature condemning them. They encourage, aid and abet discrimination and reasonable distinctions against homosexuals, bisexuals and heterosexuals engaging in sex outside of marriage.

App. at 218. Paragraph 53 of the complaint alleges:

> [P]laintiffs publish, circulate, issue, display, post and mail printed material condemning homosexuality, bisexuality and heterosexual sex outside of marriage, making reasonable distinctions based on such acts . . . .

Id. Paragraph 57 of the complaint alleges:

> Plaintiffs have always in the past, presently do and since the amendments have refused to knowingly buy from, contract with or otherwise do business with persons on the basis of that person's homosexual, bisexual or heterosexual practices.

Id. at 220. None of these allegations limit the acts Cummings avers he wishes to perform without fear of prosecution or reprisal under the LAD to acts he would perform only as a pastor of the OPC. Rather, the clear implication of these allegations, when we construe them in favor of the plaintiff, as we must, is

that Cummings has in the past, currently does and in the future will engage in conduct both in his professional and personal life that could run afoul of the statute.  We see nothing in the complaint that would support the state's conclusion that Cummings asserts only his right to preach and teach within the confines of the church as a clergyman or religious leader.  To the contrary, the portions of the complaint just quoted indicate that Cummings, as an individual, plans to engage in conduct that has a potential for violating the LAD's ban on incitement of prohibited discrimination against male or female homosexuals in employment, commerce and places of public accommodation by boycott or otherwise.[10]  Thus, provided that a threat of enforcement

_____

[10].  In an affidavit submitted in support of his opposition to summary judgment, Cummings specifically reaffirmed certain paragraphs of the complaint.  He omitted, however, paragraphs alleging the intention to engage in prohibited conduct outside the church.  The state argues that this omission indicates that Cummings does not intend to engage in such conduct outside the institutional setting therefore removing the possibility of prosecution.

We do not think that Cummings' failure to specifically reference the relevant paragraphs of the complaint is tantamount to a disavowal of their content.  If, during the pendency of the litigation, Cummings were to disavow his intention to engage in proscribed conduct, that disavowal could deprive this case of ripeness.  See Salvation Army, 919 F.2d at 192.  At this preliminary juncture, however, we are advised Cummings intends to prove at trial the allegations contained in the complaint.  At oral argument this intention was reiterated by his counsel, speaking as an officer of the court.  Absent strong indications that the allegations of the complaint have been disavowed, we are reluctant to hold a first amendment freedom of expression claim is not ripe when the complaint adequately alleges that claim, without considering Cummings' standing to assert the chilling affect of the statute's prohibitions on freedom of expression, and we are equally reluctant to consider the standing issue on this record.

restricting Cummings' First Amendment right of free speech exists, the controversy would be ripe.  Focusing solely on the question of ripeness, however, it would not be sufficient for the complaint merely to assert Cummings' rights as a citizen.  There must remain a credible threat of enforcement against him even though representations were made by the state in its affidavit disclaiming any intention to enforce the statute against religious institutions.

We have held that "[i]n order to present a justiciable controversy in an action seeking a declaratory judgment to protect against a feared future event, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgement.'"  Salvation Army, 919 F.2d at 192 (quoting Steffel v. Thompson, 415 U.S. 452, 460 (1974)).  "Where the plaintiff seeks a declaratory judgment with respect to the constitutionality of a state statute, even where the attack is on First Amendment grounds, there must be a 'real and immediate' threat of enforcement against the plaintiff."  Id. (quoting Hardwick v. Bowers, 760 F.2d 1202, 1206-07 (11th Cir. 1985), rev'd on other grounds, 478 U.S. 186 (1986)).  This threat must remain extant throughout the course of the litigation and "[w]here an intervening event removes these conditions, the court must not address the now-speculative controversy."  Id. (citing Steffel, 415 U.S. at 459 n.10 (remanding for determination of whether plaintiff still faced threat of prosecution)).

In paragraph 12 of the Stewart affidavit, the state has forsworn enforcement of the LAD with respect to church employment decisions. Stewart then states,

> Under this provision [regarding church employment practices], the plaintiffs here are free, without fear of prosecution, to make employment decisions which discriminate respecting a current or prospective employee's actual or perceived sexual orientation. Hence, such a "religious association or organization" may make decisions and engage in the practice of its sincerely-held religious beliefs within the limits only of the First Amendment. The Division has not and has no intention of construing nor enforcing the LAD in any manner which, liberally construed, would even tend or threaten to violate the sincere "tenets" of any religion. Moreover, the Division has not and has no intention to engage in any determination or judgment as to what is or is not a "religious activity" of a church, or to determine what is or is not a "tenet" of religious faith.

App. at 295-96. Although this paragraph could fairly be construed to remove the threat of enforcement against the church and its religious activities, we think it fails to eschew enforcement against speech or expressive conduct outside the setting of a religious institution or office. Similarly, in paragraph 13 of his affidavit, Stewart avers that "the Division has not in the past prosecuted and has no intention to prosecute essentially exempt churches for sincerely-held religious belief or practice, or speech consistent with such belief, or for a refusal to engage in certain speech or for following their religious tenets, all within only the limits of the First

Amendment." Id. at 296 (emphasis added). Moreover, at oral argument before this court, the state pointedly limited the scope of the immunity it offered:

>THE COURT: Do you agree with [plaintiffs' counsel's] interpretation of your affidavit?
>
>MR. LORENTZ: That the state has not waived enforcement against unnamed individuals, and against Reverend Cummings in his role outside of pastor because there's nothing in the complaint or anywhere in the case that indicates that he has any other role. Certainly, he is an individual.

Tr. at 25-26.[11]

The literal terms of the DCR waiver go no farther than the religious activities of the institutional plaintiffs and at oral argument, counsel reiterated the limits of the waiver in

_____

[11]. The colloquy continues:

>THE COURT: But [appellants] argued this morning . . . that the title of "Reverend" in that [sic] complaints is only descriptive in that he still remains as an individual plaintiff. Now is that sophistry or is there some merit to that?
>
>MR. LORENTZ: It is not our--we don't understand that the thrust of the attack that was launched on the statute originally before it was severely constricted was anything but by an institution.
>
>Obviously, because institutional protection of religion is greater under the first amendment than it is for individuals. Individuals are required to obey laws of general application.

Tr. at 26.

this respect. It is nevertheless also the state's position that the case is not ripe absent an actual prosecution. That is not the law.

In Steffel v. Thompson, 415 U.S. 452 (1974), the United States Supreme Court held that where a plaintiff seeks to exercise the First Amendment's guarantee of freedom of expression, the state need not prosecute in order to present a ripe controversy. Id. at 459. In Steffel, the plaintiff attempted to distribute handbills in a shopping center protesting the United States's involvement in Vietnam. Id. at 455. After a prior encounter with police, plaintiff returned with a companion. Id. The police arrived and informed the protestors that if they remained, they would be arrested. Id. Plaintiff left although his companion stayed and was arrested. Id. at 456. Plaintiff then commenced an injunctive and declaratory action claiming the law interfered with his First Amendment right. Id. at 454-55. The state argued the case was not ripe because there was no prosecution. The Supreme Court disagreed. "In these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." Id. at 459; see also McKay v. Heyison, 614 F.2d 899, 904 (3d Cir. 1980) ("'When the plaintiff has alleged an intention to engage in a course of conduct, arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a

criminal prosecution as the sole means of seeking relief."'" (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (quoting Doe v. Bolton, 410 U.S. 179, 180 (1973))); Chemerinsky, supra at 103 ("[I]t is well established that a case is ripe because of the substantial hardship to denying preenforcement review when a person is forced to choose between forgoing possibly lawful activity and risking substantial sanctions.").

We recognize that Steffel differs from the instant case. There the state demonstrated its willingness to prosecute others. This added immediacy to Steffel's claim that he faced prosecution if he engaged in proscribed expressive activity. Here the state has forsworn prosecution of Cummings in his clerical role, but it has refused to forswear his prosecution if he were to step off the pulpit and engage in the activities he alleges his first amendment right to freedom of expression protects. The pointed nature of that refusal, both in the state's affidavit and at oral argument indicates to us that Reverend Cummings and others who engage in the expressive activity he describes face a real threat of prosecution. In short, to the extent this record eliminates any free exercise claims as unripe it does not do so with respect to the individual free expression claims Cummings appears to advance. Here, the state has had ample opportunity to indicate that it will not

prosecute religiously motivated speakers under the aid and abet or boycott provisions.  It has elected not to do so.[12]

Accordingly, in light of the state's refusal to waive prosecution against Cummings when he acts outside of his institutional capacity as a pastor of the OPC, we conclude the threat of prosecution is "real and substantial," see Salvation Army, 919 F.2d at 192, and at least the presence of Reverend Cummings as a plaintiff in this law suit presents interests sufficiently adverse to those of the state so as to satisfy the first prong of the Step-Saver inquiry.

## 2.  Conclusiveness

The second Step-Saver factor requires us to determine whether judicial action at the present time would amount to more than an advisory opinion based upon a hypothetical set of facts. See Step-Saver, 912 F.2d at 649.  As mentioned supra, predominantly legal questions are generally amenable to a conclusive determination in a preenforcement context; however, "plaintiffs raising predominantly legal claims must still meet the minimum requirements for Article III jurisdiction."

---

[12]. The state contends that its waiver was crafted in terms of the institutional plaintiffs alone because the state considered the plaintiffs to be litigating in their institutional capacity alone and that its waiver should not be read too narrowly.  The responses of counsel at oral argument before us, however, show the state still refuses to waive prosecution outside the religious setting once the plaintiffs made it clear that they sought to assert Cummings' rights as an individual.  See supra typescript note 10.  We have already rejected the contention supra typescript at 21-24 that the complaint fails to invoke the private rights of Reverend Cummings.

Armstrong, 961 F.2d at 421 (citing Office of Communication of United Church of Christ v. FCC, 826 F.2d 101, 105 (D.C. Cir. 1987) ("[T]he presence of 'a purely legal question' is not enough, of itself, to render a case ripe for judicial review, not even as to that issue.")).

In Armstrong, we approved a rationale used by the United States Court of Appeals for the Eleventh Circuit in Atlanta Gas Light Co. v. United States Department of Energy, 666 F.2d 1359 (11th Cir.), cert. denied, 459 U.S. 836 (1982). In Atlanta Gas Light, the court held that its conclusion of ripeness was supported by factors which included the fact that the parties' claims would not substantially change in future litigation, that the current parties were appropriate to raise the issues at bar and that the parties would be subject to enforcement of the challenged act were it implemented. See id. at 1363 n.7.

Here, we see no reason why disposition of this case could not conclusively determine the largely legal issues at stake. Factual development would not add much to the plaintiffs' facial challenges to the constitutionality of the statute. To the extent that it is not distinguishable, we are unpersuaded by Voluntary Association of Religious Leaders v. Waihee, 800 F. Supp. 882 (D. Haw. 1992), where the court determined that a challenge similar to one now before us was not factually developed adequately enough to make the case ripe for disposition. Id. at 890. There, the plaintiffs challenged an amendment to an anti-discrimination statute that added sexual

orientation to the protected categories and made it illegal "to aid, abet, incite, compel, or coerce" any of the discriminatory practices listed by the statute. Id. at 884. The plaintiffs, who included a minister and a parishioner, "fail[ed] to allege that they are engaging in, or plan to engage in, any activities that would subject them to enforcement." Id. at 888. The court concluded that a vague allegation that a minister would preach to his employees about the evils of homosexuality was insufficient to pose any clear threat that he would be prosecuted under the statute. Id. at 888-89. To the extent, however, that the court concluded that a facial challenge to a statute that seeks to proscribe otherwise protected First Amendment conduct such as oral advocacy and boycott is not ripe until a concrete factual situation is before the court, see id. at 890, we disagree. Presumably, in order to give the court in Waihee a concrete factual situation, a prosecution would first be necessary. We believe that Steffel teaches that a plaintiff need not choose between prosecution and stifling otherwise protected activities.

Furthermore, the Waihee court relied on the Supreme Court decision in Renne. Id. Renne involved a challenge to a California law that prohibited political parties from endorsing candidates for non-partisan offices. Renne, 501 U.S. at 315. The Court there held that the plaintiffs' allegations that they sought to endorse officials in the future was insufficient to render the case ripe. Id. at 321.

Here, unlike Renne, Cummings alleges that he currently engages in speech and acts allegedly circumscribed by the LAD and

that he will continue to do so in the future. Even if this case were finally dismissed as not ripe, Reverend Cummings or others who share his beliefs could in the future easily assert substantially similar facial attacks on the LAD in their individual capacities. Such claims would most likely parallel those claims already presented in the present action, and as such it is unlikely that there would be any change in the substance or clarity of the challenges to the LAD. Furthermore, if the LAD is enforced against private citizens and Reverend Cummings engages in the acts alleged in paragraphs 49, 51, 57, and 69 of the complaint, in his individual capacity, he would appear to be exposed to a threat of enforcement. Reverend Cummings appears to be an appropriate party to raise the first amendment freedom of expression objections to the provisions of the LAD set out in the claim. Thus, the principles discussed in Atlanta Gas Light support a conclusion that this case is ripe if Reverend Cummings has at this point expressed enough of an adverse interest to the provisions of the LAD he refers to in the complaint to permit this case to go forward.

Indeed, it is hard to see how a more concrete factual situation would aid resolution of the plaintiffs' First Amendment free speech challenge to the statute. See Armstrong, 961 F.2d at 412. Such factual development is of minimal assistance in facial challenges such as this. Present resolution of the facial challenge would completely and decisively determine whether the amendments to the LAD that the plaintiffs object to affect the fundamental right of free speech the First Amendment protects.

Accordingly, we believe the second Step-Saver element also favors holding the controversy to be ripe.


### 3. Utility

The final Step-Saver factor focuses on the utility served by current entry of a judgment resolving the facial challenge to the Act. In this inquiry we consider "whether the parties' plans of actions are likely to be affected by a declaratory judgment." Step-Saver, 912 F.2d at 649 n.9.

It appears to us that entry of a declaratory judgment deciding the free speech issues the LAD amendments pose in the instant case would be useful to the parties and others who could be affected. Although Cummings alleges that he will engage in allegedly prohibited conduct in the future, we assume his willingness to do so is likely to be affected by resolution of this action.[13] Similarly, the state's effort to enforce certain portions of the amended LAD will be affected by the resolution of this litigation. Unlike the plaintiffs in Armstrong who "d[id] not face the threat of sanction for noncompliance with [the challenged act]," Cummings does. Armstrong, 961 F.2d at 423. A declaration of his rights and those of all others who would seek to engage in similar activity would permit a person to speak

---

[13]. Current First Amendment jurisprudence does not require a Thoreau or a Gandhi who is willing to go to jail for his beliefs but permits the more cautious Emersons among us to assert our fears of interference with our this country's fundamental rights in the civilized atmosphere of a court before subjecting ourselves to the risk of arrest and jail.

without fear of governmental sanction or regulation of their activities protected by the statute.

Accordingly, we conclude that a grant or denial of relief in this case would materially affect the parties and thus this Step-Saver factor also weighs in favor of our conclusion that this controversy is ripe. We express no opinion on the merits of this case, a task that involves the meaning and interpretation of the statutory provisions under attack and their effect on our fundamental constitutional right to freedom of speech. We think that task should be performed by the district court in the first instance.

We therefore conclude that Reverend Cummings has demonstrated a ripe controversy under the three factor test set forth in Step-Saver. Because the state's representation regarding enforcement does not eliminate the threat of enforcement against plaintiff Cummings and Cummings has averred that he does and will engage in potentially violative conduct, the parties present adverse interests in this dispute. Moreover, a final resolution of this dispute would be both conclusive on the issue and of practical help to those who seek to engage in potentially protected activity. We hold, therefore, that the district court erred in dismissing the action as unripe.[14]

---

[14]. Our reasons for so concluding also establish Cummings' standing to assert a violation of his First Amendment rights. In order for a party to present a justiciable controversy, the litigant must be "entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Selden, 422 U.S. 490, 498 (1975). At a constitutional minimum, the litigant seeking the intervention of the federal court:

(..continued)

must demonstrate three things:  (1) "injury in fact," by which we mean an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"[;] (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court"[;] and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the "prospect of obtaining relief from the injury as a result of a favorable ruling" is not "too speculative[.]"

Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, 113 S. Ct. 2297, 2301-02 (1993).  It is clear that Cummings can assert his own rights as an individual and, in light of our conclusion that the state has not foregone the threat of prosecuting Cummings for what he claims are the expressive activities he wishes to engage in as a citizen, we conclude Cummings has standing without reference to the plaintiff's standing to assert the First Amendment rights of others whose expressive activities may be chilled by the threat of prosecution under the LAD.

V.

For the foregoing reasons, we will reverse the order of the district court dismissing Reverend Cummings first amendment freedom of expression claims for lack of jurisdiction and remand for further proceedings consistent with this opinion. The state's representations clearly show that the claims of the institutional plaintiffs, Presbytery and Calvary are not ripe. Stewart, the Director of the Division on Civil Rights in the Department of Law and Public Safety of the State of New Jersey and an officer of the court swears: "[the State] . . . has no intention to prosecute essentially exempt churches for sincerely-held religious belief or practice, or speech consistent with such belief . . . . [T]his would include N.J.S.A. 10:5-12c, N.J.S.A. 10:5-12e, N.J.S.A. 10:5-12j, N.J.S.A. 10:5-12 l and N.J.S.A. 10:5-12m." App. at 296-97. Therefore, we will affirm the district court's decision as it applies to the institutional plaintiffs.

RE: THE PRESBYTERY OF NEW JERSEY OF THE ORTHODOX PRESBYTERIAN CHURCH, et al., Appellants v. JAMES FLORIO, GOVERNOR OF NEW JERSEY, et al., No. 93-5559

---

ROSENN, Circuit Judge, dissenting.

The majority correctly concludes that this suit is not ripe with respect to the institutional parties. However, I disagree with the majority's conclusion that "the controversy is ripe" because Rev. David Cummings arguably alleges as an individual that the statute threatens his right of speech. This conclusion ignores completely the allegations in the complaint that he is suing as the pastor of the Orthodox Presbyterian Church of New Jersey. I therefore respectfully dissent because I believe this case is not ripe for judicial disposition.

Article III, section 2 of the United States Constitution limits federal jurisdiction to actual "cases" and "controversies." U.S. Const. art III § 2. Thus, it forbids the issuance of advisory opinions. "The case or controversy requirement must be met regardless of the type of relief sought, including declaratory relief." Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 410 (3d Cir. 1992) (citation omitted). Additionally, "even if a declaratory judgment would clarify the parties' legal rights, it should ordinarily not be granted unless `the parties' plans of actions are likely to be affected by a declaratory judgment.'" Id. at 412 (citation omitted). Also, in cases concerning the Constitutionality of state statutes, this

court should consider "the advantage of permitting state courts further opportunity to construe the challenged provision and perhaps in the process materially alter the question to be decided." Id. (citation omitted) (quotation omitted). Finally, this court must presume that it lacks jurisdiction unless the record affirmatively demonstrates that jurisdiction exists; i.e. the plaintiff must persuade this court that jurisdiction exists. Renne v. Geary, 501 U.S. 312, 316 (1991).

Federal courts consider three primary factors when reviewing a declaratory judgment action for ripeness: (1) adversity of interest between plaintiffs and defendants, (2) conclusivity, and (3) utility. Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 647 (3d Cir. 1990).[15] The court weighs these and other relevant factors to determine if the issue is ripe. Here, the case is not ripe because no adversity of interest exists between the parties involved in this suit in light of the extensive protection afforded by New Jersey's Law Against Discrimination (LAD) from interference with plaintiffs' religious practices. Moreover, the Director of New Jersey's Division on Civil Rights has represented that the State has not in the past prosecuted and has no intention to prosecute exempt religious organizations for religious beliefs, practices, or

---

[15]. See, majority opinion at 14-19 for a thorough and informative discussion of ripeness jurisprudence.

speech.  Therefore, the conclusiveness and utility of a judgment rendered at this time are doubtful.

The majority correctly notes that the State of New Jersey has expressed its intention not to prosecute Rev. Cummings for actions taken as a member of the clergy engaging in the performance of religious functions and that the State has refused to waive enforcement of LAD against Cummings as an individual. The majority properly concludes that Cummings cannot pursue this suit as a representative of the church.  The majority, however, strains in an effort to conclude that Cummings has sued in his individual capacity and in that capacity can pursue this case.

Cummings is clearly identified in the complaint as "Rev. David B. Cummings." see e.g., plaintiffs' caption in First Amended Complaint and ¶¶ 1 and 4.  The complaint does not allege that he sues in a secular capacity as an individual church member.  Moreover, when this court heard an earlier appeal in this same case on an appeal from an order denying the plaintiffs' application for a preliminary injunction, its memorandum opinion addressed Cummings only in his role as "an ordained minister of the Presbytery and the pastor of one of its member churches." In that appeal, appellants did not maintain that Cummings was acting as an individual and appellants have never amended their complaint to include Cummings or others as individual plaintiffs. Paragraph 4 of the complaint in this case specifically avers: "plaintiff, Rev. David B. Cummings, is an ordained minister of

the Presbytery, and the pastor of one of its New Jersey churches."  No reference is made to him as an individual.  If any residual question still remains at this point as to Cummings' status in this litigation, it is dissipated by paragraph 45 of the complaint.  It states:  "[t]he individual plaintiff [Cummings] is an agent of these entities [the churches]."

The majority does not point to any  language that describes Cummings as an individual.[16]  In fact, the first of the three paragraphs from the complaint quoted by the majority in support of their conclusion begins "[p]laintiff Cummings, other pastors and members of their congregations . . . ."  ¶ 51 of complaint (emphasis added).  The plaintiffs' use of the words "other pastors" immediately after "plaintiff Cummings" confirms that Cummings is acting as a pastor in this litigation and not as an individual.  The additional paragraphs from the complaint quoted by the majority contain references to actions by "plaintiffs" without providing any evidence that the referenced "plaintiffs" include any individuals.

The district court observed that the individual members of the appellant churches were not plaintiffs in this action. Presbytery of N.J. of Orthodox Presbyterian Church v. Florio, 830 F.Supp 241, 249 (D.N.J. 1993).  The record supports this observation.  First, the complaint's caption lists only one

---

[16].  Interestingly, of the three paragraphs quoted by the majority, Cummings only adopts paragraph 53 in his Affidavit in support of the complaint.

individual, Reverend Cummings.[17]  Second, the record contains no

information demonstrating that any of the church members are

represented by the named plaintiffs or have consented to

inclusion in this law suit.[18]  The district court properly noted

that a ripe declaratory judgment action requires "a `real and

immediate' threat of enforcement <u>against the plaintiff</u>." 830

F.Supp at 249 (quoting <u>Salvation Army v. Department of Community</u>

<u>Affairs</u>, 919 F.2d 183, 192 (3d Cir. 1990) (emphasis added by

district court).  Cummings brought this suit as an institutional

representative.  After the State's affidavit averred that it

would not prosecute him under LAD for actions taken as a pastor,

no legitimate case or controversy remained.

          Even if Cummings had pursued this case as an individual

from the beginning, it is not ripe.  "Where the plaintiff seeks a

declaratory judgment with respect to the constitutionality of a

state statute, even where the attack is on First Amendment

grounds, there must be a `real and immediate' threat of

---

[17].  I do not agree with the majority's supposition that
"Reverend" is used as a purely honorary term.  In the context of
this litigation, where the plaintiffs have carefully shielded
Cummings from the possibility of counter-claims and the
assessment of costs, "Reverend" is used precisely; it signifies
Cummings' role as an institutional representative and separates
Cummings the church representative, the plaintiff in this case,
from Cummings the individual.

[18].  On appeal, appellant contends that they are acting on behalf
of their church members.  However, they have provided no
persuasive evidence to support this contention; mere references
to church members within the body of the complaint are
insufficient.

enforcement." Salvation Army, 919 F.2d at 192 (quoting Hardwick v. Bowers, 760 F.2d 1202, 1206-7 (11th Cir. 1985)). Nothing in the record demonstrates any realistic threat that the state will enforce the amendments against Cummings as an individual. The State has merely refused to waive its right to prosecute Cummings; it has not taken any steps to prosecute him or anyone else under LAD. In a careful analysis, the able and experienced district judge noted that "[t]he plaintiffs' professed fears of state enforcement of the LAD against their members appear to be based only on imagination or speculation, which is insufficient to create a ripe controversy." 830 F.Supp at 249 (citation omitted).

Despite the State's refusal to waive enforcement of the LAD against Cummings and other members of the congregation as individuals, the record supports the district court's finding that there is no realistic threat that the State will enforce the law against them. In the almost two years since the LAD became effective, neither the State nor any private individual has filed a complaint against a church member. Moreover, the district court found that the threat of an administrative or private suit has not had any discernible effect on their conduct. 830 F.Supp at 249. To the contrary, the plaintiffs concede that since the enactment of the LAD in 1992, they have discriminated and spoken out against people based on their sexual orientation. The court thus found that the prospect that the plaintiffs will alter their

actions out of fear of a suit under the LAD is highly unlikely. 830 F.Supp at 249. See Salvation Army, 919 F.2d at 193.

The plaintiffs have not demonstrated a real and substantial probability that the litigation they fear will occur; almost two years have passed since the LAD became effective and no private suit or administrative complaint has been filed. See Armstrong, 961 F.2d at 412. Additionally, the district court found that there is "no credible evidence that any person or organization is contemplating such an action." 830 F.Supp at 249. The theoretical possibility that someone may file such a suit at some time in the future is not sufficient to render this action ripe. See Salvation Army, 919 F.2d at 193. Moreover, this court has noted that the relief the plaintiffs seek would not bind unidentified private parties and protect plaintiffs from private suits.

In addition to showing that the issues in this case are not fit for judicial decision, the record also shows that the withholding of an opinion at this time will not work a hardship on the parties. Despite the plaintiffs' arguments to the contrary, they will suffer no "immediate and significant" hardship from the district court's decision not to adjudicate this action at this time. See Felmeister v. Office of Attorney Ethics, Div. of New Jersey Administrative Office of Courts, 856 F.2d 529, 537 (3d Cir. 1988). The court found that the plaintiffs have not changed their behavior due to the LAD

amendments, that defendants will not subject the plaintiffs to an enforcement action, and that private enforcement of the statute against the plaintiffs is uncertain.  Thus, the court did not err in concluding that its withholding of an opinion will not work a hardship on the plaintiffs.

Regardless how one views the merits of the amendments to the LAD, there is no reason whatsoever why this court should struggle to construct a theoretical controversy where none exists.  Under the three Step-Saver factors, this case is not ripe for resolution.  Therefore, I would affirm the order of the district court dismissing plaintiffs' action.