**PENNSYLVANIA FAMILY INSTITUTE, INC., et al., Plaintiffs,**

v.

**John R. CELLUCI, et al., Defendants.**

**Civil Action No. 07–1707.**

United States District Court, E.D. Pennsylvania.

May 14, 2007.

See, also, 489 F.Supp.2d 447.

---

Randall Luke Wenger, Clymer & Musser P.C., Lancaster, PA, for Plaintiffs.

David M. Donaldson, Administrative Office of PA Courts, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

KATZ, Senior District Judge.

Before the court are Defendants' Motion to Dismiss (Document No. 7). For the following reasons, the motion will be denied.

### I. Factual Background

### A. The Canon at Issue

Rule 8.2(b) of the Pennsylvania Rules of Professional Conduct declares that "[a] lawyer who is a candidate for judicial office shall comply with the applicable provisions of the Code of Judicial Conduct." Canon 7B(1)(c) of the Pennsylvania Code of Judicial Conduct reads as follows:

(1) Candidates, including an incumbent judge, for a judicial office that is filled either by public election between competing candidates or on the basis of a merit system election:

. . . .

(c) should not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; make state-

ments that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court; or misrepresent their identity, qualifications, present position, or other fact. PA.CODE OF JUD. CONDUCT, Canon 7B(1)(c) (2007). The first two clauses of Canon 7B(1)(c) are at issue in this case. Plaintiffs designate as the *"pledges and promises clause"* the first clause: "Candidates ... for a judicial office ... should not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office"; they designate as the *"commits clause"* the second clause: "Candidates ... for a judicial office ... should not ... make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court."

1. The names of these six Plaintiffs are, in alphabetical order: Jeffrey J. Reich; Howard F. Knisely; Donald R. Totaro; Margaret C. Miller; Jeffrey D. Wright; and Christopher A. Hackman. *Id.* ¶¶ 8–13.

2. The Pennsylvania Constitution vests the JCB with the authority to investigate and prosecute any alleged violation of the Code of Judicial Conduct by "a justice, judge or justice of the peace." *See* PA. CONST., art. V, §§ 17(b), 18(a)(7); *see also* 42 PA. C.S.A. § 2105 (2007).

3. *See* 42 PA. C.S.A. § 2101(a) (2007) ("In accordance with section 18 of Article V of the Constitution of Pennsylvania, the Judicial Conduct Board shall be an independent board within the Judicial Branch and shall consist of 12 persons selected as provided in this subchapter."). The names of these Defendants—the 12 members of the JCB—are, in alphabetical order: John R. Celluci, III; Charles A. Clement; Charles J. Cunningham; Cecilia Griffen Golden; Patrick Judge; Edward R. Klett; G. Craig Lord; Charlene R. McAbee; Cynthia N. McCormick; Jack A. Panella; Carolyn W. "Raven" Rudnitsky; and James R.Weaver. *See* Compl. ¶ 14.

### B. The Parties

Plaintiffs in this action are the Pennsylvania Family Institute, Inc. ("PFI"), "a nonprofit, nonpartisan, research and education organization" incorporated in the Commonwealth of Pennsylvania, *see* Compl. ¶ 7, Exhibit 5, and six residents of Lancaster County, Pennsylvania, who also are candidates for the Court of Common Pleas in Lancaster County in the 2007 judicial elections (the "Candidate Plaintiffs").[1] *Id.* ¶¶ 8–13, 17.

Defendants in this action are all 12 members of the Pennsylvania Judicial Conduct Board ("JCB"),[2,3] *id.* ¶ 14, as well as the Chief Disciplinary Counsel of the Pennsylvania Office of Disciplinary Counsel ("ODC"), his Deputy, and the disciplinary counsel in charge of the ODC's Offices in Districts I, II, III, and IV.[4,5] *Id.* ¶ 15. All Defendants are being sued in their official capacities. *Id.* ¶¶ 14, 15.

4. Under the Pennsylvania Rules of Disciplinary Enforcement, the Chief Disciplinary Counsel and his or her assistants have the authority to investigate and prosecute any alleged violation of the Rules of Professional Conduct by "[a]ny attorney admitted to practice law in this Commonwealth," and by "[a]ny attorney who is a justice, judge or magisterial district judge with respect to acts prior to taking office as a justice, judge or magisterial district judge, if the Judicial Inquiry and Review Board declines jurisdiction with respect to such acts." *See* PA. R.D.E. 103, 201(a)(1) and (a)(4), 203(a), 207(b). (The "Judicial Inquiry and Review Board" is now called the "Judicial Conduct Board.")

5. The names of these six Defendants are, in alphabetical order: Paul J. Killion (Chief Disciplinary Counsel); Paul J. Burgoyne (Deputy Chief Disciplinary Counsel); Anthony P. Sodroski (District I Office Disciplinary Counsel in Charge); Raymond W. Wierciszewski (District II Office Disciplinary Counsel in Charge); Edwin W. Frese, Jr. (District III Office Disciplinary Counsel in Charge); and Angelea Allen Mitas (District IV Office Disciplinary Counsel in Charge). *Id.* ¶ 15.

## C. Plaintiffs' Two Claims

Plaintiffs' "Verified Complaint for Injunctive and Declaratory Relief" consists of two Counts,[6] both of which seek relief under the "free speech" clause of the First Amendment of the United States Constitution,[7] which applies against the States through the Fourteenth Amendment.[8] Count I's heading declares that "Canon 7B(1)(c)'s 'pledges and promises' clause and 'commits' clause are, on their face, unconstitutionally vague and overbroad, prohibiting and chilling judicial candidates' protected political speech and impinging on Plaintiffs' freedom of speech and association." *See also id.* ¶¶ 43–48. Count II's heading states that "Canon 7B(1)(c)'s 'pledges and promises' clause and 'commits' clause, as applied to the ACTION questionnaire and the PFI questionnaire, unconstitutionally prohibit and chill judicial candidates' protected political speech and Plaintiffs' freedom of speech and association." [9] *See also id.* ¶¶ 49–56. Plaintiffs

**6.** In support of these two Counts, Plaintiffs allege the following:

[38. Because of the pledges and promises clause and commits clause,] [j]udicial candidates are unable to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day. Judicial candidates cannot tell the public their views on disputed political and legal issues. By prohibiting judicial candidates from exercising their freedom of speech on legal and political issues of concern to the voters, the pledges and promises clause and commits clause require judicial candidates to withhold essential or important information from the voters as they seek to educate voters and participate fully in democracy.

39. As a result of the pledges and promises clause and commits clause, although PFI would like to publish and distribute the answers to questions 5, 6, 7, and 8 of the PFI Questionnaire, PFI is now unable to fully exercise their free speech and association rights to receive and publish political information, since the judicial candidates must refuse to answer the questions in the PFI Questionnaire. Further, if PFI publishes the substantive responses it has received to questions 5, 6, 7, and 8, it fears it will expose responsive judicial candidates to discipline.

40. In addition, the Candidate Plaintiffs, as judicial candidates, are unable to exercise their freedom of speech and right of association because Canons [sic] 7B(1)(c)'s pledges and promises clause and commits clause require judicial candidates to withhold essential or important information from voters. The Candidate Plaintiffs would like to express their views on various disputed legal and political issues, including by answering the PFI Questionnaire and the ACTION Questionnaire, but will not do so because they fear discipline under the canons. The Candidate Plaintiffs do not wish to pledge or promise certain results in particular cases or classes or types of cases, but merely wish to announce their views on disputed legal and political issues. Answering the PFI Questionnaire and ACTION Questionnaire and announcing their views on disputed legal and political issues would not cause the Candidate Plaintiffs to be biased for or against any party and would not prevent them from remaining open-minded on any issue raised in the PFI Questionnaire or ACTION Questionnaire.

*Id.* ¶¶ 38, 39, 40 (internal citations omitted).

**7.** *See* U.S. CONST. amend. I ("Congress shall make no law ... abridging the freedom of speech ....").

**8.** *See Near v. Minnesota,* 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

**9.** In support of their request for injunctive relief, Plaintiffs allege the following:

41. Immediate and irreparable injury, loss, and damage has occurred and will continue to occur as a result of the application of the pledges and promises clause and the commits clause of Judicial Canon 7B(1)(c) to responses to the ACTION Questionnaire or PFI Questionnaire, or to other announcements of views by judicial candidates, which chill Plaintiffs' free speech and free association rights.

42. Plaintiffs have no adequate remedy at law.

request a declaratory judgment holding the "pledges and promises" and "commits" clauses unconstitutional under Counts I and II, as well as injunctive relief,[10] attorney's fees, and costs.

### D. The ACTION Questionnaire and the PFI Questionnaire

#### 1. The ACTION Questionnaire

Lancaster County ACTION ("LCA") is an organization that, according to its website, "promote[s] the election of men and women to local, state, and national offices who support the Judeo–Christian principles on which this nation was founded." *See Who Is Lancaster County ACTION?*, http://www.lancastercountyaction.org/whoweare.cfm (last visited May 10, 2007). As part of LCA's effort to prepare a voter's guide for the 2007 judicial primary elections, LCA sent each Candidate Plaintiff a five-question questionnaire (the "ACTION Questionnaire"), entitled "Primary / 2007 Issues Survey," and requested a response by April 9, 2006.[11] *See* Compl. ¶ 18, Exhibit 3. According to the Complaint, this questionnaire asked the Candidate Plaintiffs "to announce their views on several disputed legal and political issues." [12] Compl. ¶ 18. In a letter dated April 6, 2007, the Candidate Plaintiffs signed a joint response to the ACTION Questionnaire that read as follows:

[In response to questions] 1, 3–5: All of us, the Endorsed Republican Judicial candidates, pledge that, if elected, we will faithfully and impartially perform the duties of that office. Beyond that, Canon 7B(1)(c) of the Code of Judicial Conduct prohibits us from commenting on or making statements which appear to commit us with respect to the issues addressed in these questions.

[In response to question] 2. All of the Endorsed Republican Judicial candidates share a judicial philosophy of strict constructionism in which the role of the Court is to enforce the laws as written and not to legislate from the bench.

Compl., Exhibit 4; *see also id.* ¶ 19. On April 12, 2007, Candidate Plaintiff Donald R. Totaro sent a letter to the Judicial Ethics Committee of the Pennsylvania Conference of State Trial Judges, asking whether he was prohibited by Canon

---

*Id.* ¶¶ 41, 42.

10. Plaintiffs' motion for a preliminary injunction will be ruled upon in a separate Memorandum and Order.

11. The court suspects that "2006" is a typographical error.

12. The ACTION Questionnaire reads, in pertinent part, as follows:

**Questionnaire for Judicial Candidates**

Please circle the letter that best represents your position.

"Y"—Yes, "N"—No, "U"—Undecided, "D"—Decline to Answer

1. Do you believe that Roe v. Wade, 410 U.S. 113 (1973), insofar as it recognizes a "right to privacy" that includes abortion under the United States Constitution, was correctly decided?    **Y  N  U  D**

2. Rate your judicial philosophy on a scale of 1–5 with "living document" approach being a 1—strict constitutionalist or 5—originalist.    **1  2  3  4  5**

3. Do you believe that the Pennsylvania Constitution permits display of the 10 Commandments in courtrooms?    **Y  N  U  D**

4. Do you believe that the Pennsylvania Constitution recognizes the right to same-sex marriage?    **Y  N  U  D**

5. Do you believe that the Pennsylvania Constitution permits student-led graduation prayers in public schools?    **Y  N  U  D**

*See* Compl., Exhibit 3.

7B(1)(c) from answering the ACTION Questionnaire. *Id.* ¶ 20. In correspondence dated April 13, 2007, the Judicial Ethics Committee responded that it was not authorized to advise whether judicial candidates could respond to the ACTION Questionnaire. *Id.*

## 2. The PFI Questionnaire

Plaintiff PFI, among other things, gathers information and publishes questionnaires to educate citizens about candidates for public office. *Id.* ¶ 21, Exhibit 5 ("Our goal is to inform the electorate of the candidates' positions on issues that are important to the voters."). As part of its effort to prepare an online voter's guide for the 2007 Pennsylvania judicial elections, on April 3, 2007, Plaintiff PFI mailed an explanatory cover letter and a "2007 Pennsylvania Family Institute Voters' Guide Questionnaire for Judicial Candidates" to every candidate for judicial office in Pennsylvania. *Id.* ¶ 22, Exhibits 5 (explanatory cover letter) and 6 ("PFI Questionnaire"). The letter requested a reply to the eight-question PFI Questionnaire by April 13, 2007 and explained that "[w]e will simply report [through a Voter's Guide posted on our internet website] without comment your responses made to the Questionnaire, as well as a brief biography (experience, education) and your campaign telephone number." *Id.* ¶ 22, Exhibit 5.

The letter also included the following two paragraphs:

As a judicial candidate, we understand that you are subject to the Pennsylvania Code of Judicial Conduct. We believe your responses to our Questionnaire are constitutionally protected under *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), which struck down on First Amendment grounds a Minnesota Judicial Canon that prohibited judicial candidates from "announc[ing] their views on disputed legal or political issues." However, if you remain fearful that you may not answer our Questionnaire under the Code of Judicial Conduct, then you should seek an advisory opinion from [the Pennsylvania Judicial Conduct Board].

Lawyers seeking judicial office are subject to the Judicial Code of Conduct, and you may seek an advisory opinion on whether, as a lawyer, you may respond to our Questionnaire from [the Pennsylvania Lawyers' Disciplinary Board].

*Id.* Exhibit 5.

The Candidate Plaintiffs received copies of the PFI Questionnaire but did not respond, because they believed that answering some of the questions on the PFI Questionnaire would violate Canon 7B(1)(c).[13] *Id.* ¶ 23.

---

**13.** The PFI Questionnaire reads, in pertinent part, as follows:

**2007 Pennsylvania Family Institute Voters' Guide Questionnaire for Judicial Candidates**

1. Which of the following *former* U.S. Presidents best represents your political philosophy? **(Circle one)**

-John F. Kennedy     -Jimmy Carter
-Ronald Reagan     -George Bush (former)
-Bill Clinton     -Undecided
-Decline to Respond Because of Judicial Canons*
-Refuse to Answer for Other Reason
(describe): _____

2. Which one of the *current* Justices of the U.S. Supreme Court most reflects your judicial philosophy? **(Circle one)**

-Roberts     -Stevens     -Scalia
-Kennedy     -Thomas     -Souter
-Ginsburg     -Breyer     -Alito
-Undecided
-Decline to Respond Because of Judicial Canons*
-Refuse to Answer for Other Reason
(describe): _____

3. Rate your judicial philosophy on a scale of 1–10 with "living document" approach as a "1" and "strict constitutionalist" or "originalist" as a "10." **(Circle one)**

1  2  3  4  5  6  7  8  9  10

Twenty-one judicial candidates responded to the PFI Questionnaire.[14] *Id.* ¶ 24. Nineteen returned completed questionnaires; two—M. Lucile Longo, Esq. and the Honorable Anne E. Lazarus—sent letters instead.[15] *Id.* In a letter dated April 11, 2007, Ms. Longo declined to answer the PFI Questionnaire, because she believed "that doing so would violate the Pennsylvania Code of Judicial Conduct, or its spirit." [16] *Id.* Exhibit 7, at 1. In a letter dated April 19, 2007, Judge Lazarus also declined to answer the PFI Questionnaire and explained her decision as follows:

-Decline to Respond Because of Judicial Canons*
-Refuse to Answer for Other Reason
  (describe): _____

4. Please list the five organizations in which you are most involved as a member, through contributions, and/or through volunteering.

1._____
2._____
3._____
4._____
5._____

-Decline to Respond Because of Judicial Canons*
-Refuse to Answer for Other Reason
  (describe): _____

5. Do you believe that *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), insofar as it recognizes a "right to privacy" that includes abortion under the United States Constitution, was correctly or incorrectly decided? **(Circle one)**

-Correctly          -Incorrectly          -Undecided
  Decided               Decided
-Decline to Respond Because of Judicial Canons*
-Refuse to Answer for Other Reason
  (describe): _____

6. Do you believe that the Pennsylvania Constitution permits display of the Ten Commandments in courtrooms? **(Circle one)**

-Yes          -No          -Undecided
-Decline to Respond Because of Judicial Canons*
-Refuse to Answer for Other Reason
  (describe): _____

7. Do you believe that the Pennsylvania Constitution recognizes a right to same-sex marriage? **(Circle one)**

-Yes          -No          -Undecided
-Decline to Respond Because of Judicial Canons*
-Refuse to Answer for Other Reason
  (describe): _____

8. Do you believe that the Pennsylvania Constitution permits student-led graduation prayers in public schools? (Circle one)

-Yes          -No          -Undecided
-Decline to Respond Because of Judicial Canons*
-Refuse to Answer for Other Reason (describe):
  _____

*See* Compl., Exhibit 6. On each page of the PFI Questionnaire, a star footnote (corresponding to the star after the "Decline to Respond Because of Judicial Canons" answer choice) read as follows:

> * By circling this phrase, I hereby attest that I would have replied to this question but for the prospect that I may be disciplined for announcing my views under Canon 7(B)(1)(c) of the Pennsylvania Code of Judicial Conduct, which states that judicial candidates may not "make pledges or promises of conduct in office" or "make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court," and that I may be disciplined for failure to disqualify myself as a judge in any proceeding concerning the issue raised in the question under Canon 3(C)(1), which states that judges must disqualify when their "impartiality might reasonably be questioned." I further attest that responding to this question would neither cause me to be biased for or against parties nor affect my ability to be open-minded with regard to any issue.

*See id.*

14. To summarize the content of these candidates' responses to the PFI Questionnaire, the court does not need to say how each candidate answered each question. Anyone wishing to obtain that information, however, need only examine the candidates' responses in Exhibit 7 of the Complaint.

15. Plaintiffs have attached to the Complaint as Exhibit 7 these two letters and seventeen of the nineteen completed questionnaires.

16. Ms. Longo added that "[a]dditionally, I have sought an advisory opinion from the Pennsylvania Conference of State Trial Judges, Ethics Committee and do not anticipate receiving that opinion prior to your deadline. I have been advised the process takes approximately thirty days." *Id.*

Unfortunately, as a sitting judge and a candidate for the Superior Court, I feel it would be inappropriate for me to opine on many of the specifics about which you ask. As a judge, I must review each case independently and I believe that by answering a questionnaire I am forced to take sides, blurring my view of justice.

*Id.* at 2.[17]

Of the nineteen candidates who returned completed PFI Questionnaires, eighteen answered question 1, which asked the candidate to indicate "Which of the following *former* U.S. Presidents best represents your political philosophy?" *Id.* ¶ 25, Exhibit 6, at 1. Only one candidate circled the answer option "Decline to Respond Because of Judicial Canons*." *Id.* The star footnote for this answer choice contains the following explanation:

By circling this phrase, I hereby attest that I would have replied to this question but for the prospect that I may be disciplined for announcing my views under Canon 7(B)(1)(c) of the Pennsylvania Code of Judicial Conduct, which states that judicial candidates may not "make pledges or promises of conduct in office" or "make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court," and that I may be disciplined for failure to disqualify myself as a judge in any proceeding concerning the issue raised in the question under Canon 3(C)(1), which states that judges must disqualify when their "impartiality might reasonably be questioned." I further attest that responding to this question would neither cause me to be biased for or

against parties nor affect my ability to be open-minded with regard to any issue.

*Id.* Despite this footnote, "Plaintiffs do not believe, based on [the candidates'] responses and the plain language of the Canons, that judicial candidates are prohibited by Canon 7B(1)(c) from answering question 1." *Id.* ¶ 25.

Two candidates declined to answer question 2, which asked the candidate to indicate "Which one of the *current* Justices of the U.S. Supreme Court most reflects your judicial philosophy?" *Id.* ¶ 26, Exhibit 6, at 1. Three candidates declined to answer question 3, which asked the candidate to "Rate your judicial philosophy on a scale of 1–10 with "living document" approach as a "1" and "strict constitutionalist" or "originalist" as a "10," " *id.* ¶ 27, Exhibit 6, at 2, and one candidate declined to answer question 4, which asked the candidate to "Please list the five organizations in which you are most involved as a member, through contributions, and/or through volunteering." *Id.* ¶ 28, Exhibit 6, at 2. These candidates circled the answer option "Decline to Respond Because of Judicial Canons*," the star footnote for which contains the same explanation set forth above. Despite this footnote, "Plaintiffs do not believe, based on [the candidates'] responses and the plain language of the Canons, that judicial candidates are prohibited by Canon 7B(1)(c) from answering" questions 2, 3, or 4 *Id.* ¶¶ 26, 27, 28.

Seven candidates declined to answer question 5, which asked the candidate to announce his or her views by answering the following question: "Do you believe that *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), insofar as it

---

17. Interestingly, Judge Lazarus went on to write that "[i]mportantly, at a time when too many have lost faith in our political and judicial systems, I serve as the Chair of the State Conference of Trial Judges' Ethics Committee, a position that I have had for the last 2 years." *Id.*

recognizes a 'right to privacy' that includes abortion under the United States Constitution, was correctly or incorrectly decided?" *Id.* ¶ 29, Exhibit 6, at 2. Six candidates declined to answer question 6, which asked the candidate to announce his or her views by answering the following question: "Do you believe that the Pennsylvania Constitution permits display of the Ten Commandments in courtrooms?" *Id.* ¶ 31, Exhibit 6, at 3. Six candidates declined to answer question 7, which asked the candidate to announce his or her views by answering the following question: "Do you believe that the Pennsylvania Constitution recognizes a right to same-sex marriage?" *Id.* ¶ 33, Exhibit 6, at 3. Six candidates declined to answer question 8, which asked the candidate to announce his or her views by answering the following question: "Do you believe that the Pennsylvania Constitution permits student-led graduation prayers in public schools?" *Id.* ¶ 35, Exhibit 6, at 3. These candidates circled the answer option "Decline to Respond Because of Judicial Canons\*," the star footnote for which contains the same explanation set forth above. *Id.* ¶¶ 29, 31, 33, 35.

According to the Complaint, one candidate answered question 5; two candidates answered question 6; two candidates answered question 7; and two candidates answered question 8. *Id.* ¶¶ 29, 31, 33, 35.[18] "However, PFI will not publish [these] responses, for fear that [the candidates]

will be disciplined under the canons." *Id.* The Complaint further alleges that "the Candidate Plaintiffs would have answered" questions 5, 6, 7, and 8 on the PFI Questionnaire "but for the belief that they were prohibited from doing so by Canon 7B(1)(c)." *Id.* ¶¶ 30, 32, 34, 36.

Plaintiff PFI wants to publish the judicial candidates' views on legal and political issues to educate and inform the citizenry. *Id.* ¶ 37. Moreover, Plaintiff PFI intends to publish the judicial candidates' responses to the PFI Questionnaire before the May 15, 2007 primary elections and the November 8, 2007 general and retention elections. *Id.* Plaintiff PFI also intends to publish on its website the responses of future judicial candidates to identical questionnaires. *Id.*

## II. Legal Standard

In their motion to dismiss, Defendants "respectfully request that this Court dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure

12(b) with prejudice." Defendants do not invoke a particular subsection of Rule 12(b), but Defendants' standing and ripeness arguments make it clear that the court should decide the motion under FED. R. CIV. P. 12(b)(1), which governs motions to dismiss for lack of subject matter jurisdiction.[19]

---

18. These assertions seem at odds with the completed surveys attached to the Complaint as Exhibit 7, which seem to show that eleven candidates answered questions 5, 6, 7, and 8. The court will accept the Complaint's assertions as true, however, since it would be improper not to do so in the context of Defendants' facial challenge to the court's subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). *See* Section II, *infra.*

19. There is ample authority for deciding motions to dismiss for lack of standing or ripeness under Rule 12(b)(1). *See Taliaferro v.*

*Darby Twp. Zoning Bd.,* 458 F.3d 181, 187–88 (3d Cir.2006) (reviewing the district court's dismissal for lack of standing under Rule 12(b)(1)); *Philadelphia Fed'n of Teachers, Am. Fed'n of Teachers, Local 3, AFL–CIO v. Ridge,* 150 F.3d 319, 321 (3d Cir.1998) (reviewing the district court's dismissal for lack of ripeness under Rule 12(b)(1)); *see also* 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3531.15 n. 9 (2d ed.1984) (discussing standing); *id.* § 3532.1 n. 38.5 (discussing ripeness).

The Third Circuit has summarized the law governing Rule 12(b)(1) motions to dismiss as follows:

> Challenges to subject matter jurisdiction under Rule 12(b)(1) may be "facial" or "factual." Facial attacks ... contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true. In contrast, a trial court considering a factual attack accords plaintiff's allegations no presumption of truth. In a factual attack, the court must weigh the evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings.

*Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 300 n. 4 (3d Cir.2002) (internal citations omitted); *see also NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir.2001) ("[W]hen, as here, defendants move to dismiss a complaint under Rule 12(b)(1) for failure to allege subject matter jurisdiction we treat the allegations of the complaint as true and afford the plaintiff the favorable inferences to be drawn from the complaint."). "A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir.2000) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)); [20] *see also Gibbs v. Buck*, 307 U.S. 66, 71–72, 59 S.Ct. 725, 83 L.Ed. 1111 (1939) ("As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court."); 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1350 n. 47 (3d ed.2004). Neither party has advanced a position on whether the court should consider Defendants' motion a facial or factual challenge. Since this action was filed less than three weeks ago, the court, in the exercise of its discretion, finds it more appropriate to consider Defendants' motion a facial challenge to its jurisdiction.[21]

## III. Discussion

Defendants advance two arguments for dismissing the Complaint for lack of subject matter jurisdiction. First, they argue that Plaintiff's lack standing; second, they argue that Plaintiff's claims are not ripe for adjudication. The court rejects both of these arguments and therefore will deny Defendants' motion to dismiss.

### A. Standing

#### 1. Standing Doctrine

The Third Circuit recently summarized the law governing standing as follows:

> Article III of the Constitution restricts the "judicial power" of the United States to the resolution of cases and controversies. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Subsumed within this restriction is the requirement that a litigant have stand-

---

**20.** Significantly, the *Gould Electronics* court expounded on how courts should handle facial attacks under Rule 12(b)(1), writing that "[i]n reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." 220 F.3d at 176. It added that it could "think of no principled reason why a court, in resolving a Rule 12(b)(6) [sic] facial attack should not also consider documents attached to the complaint" when courts are permitted to do so in the context of Rule 12(b)(6) motions to dismiss for failure to state a claim. *Id.* at n. 6 (citing *PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir.1993)).

**21.** Defendants may challenge the court's jurisdiction factually at a later date, when the record is more fully developed.

ing to challenge the action sought to be adjudicated in the lawsuit. *Id.* Standing has constitutional and prudential components, both of which must be satisfied before a litigant may seek redress in the federal courts. *Id.; Wheeler v. Travelers Ins. Co.,* 22 F.3d 534, 537 (3d Cir. 1994). Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed. *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293, 296 (3d Cir.2003). *Taliaferro v. Darby Twp. Zoning Bd.,* 458 F.3d 181, 188 (3d Cir.2006).

■ With regard to the constitutional component of standing, the Supreme Court has declared:

[T]he irreducible constitutional minimum of standing contains three elements. *First,* the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Second,* there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Third,* it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (emphasis added; internal cita-

tions, quotations, and footnote omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561, 112 S.Ct. 2130. But "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation omitted). In the First Amendment context, the more relaxed rule on standing is: "where a [willing] speaker exists ... the protection afforded is to the communication, to its source and to its recipients both." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *see also United States v. Wecht,* 484 F.3d 194, 202 (3d Cir.2007);[22] *Application of Dow Jones & Co., Inc.,* 842 F.2d 603, 607 (2d Cir.1988) (citing *Virginia State Bd. of Pharmacy* as authority to find standing under circumstances similar to those in *Wecht* ).

■ With regard to the prudential component of standing, the Supreme Court has observed:

Although we have not exhaustively defined the prudential dimensions of the standing doctrine, we have explained that prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately ad-

---

**22.** In the context of a challenge to a gag order brought by third-party media outlets, the *Wecht* Court explained the requirements for standing under the First Amendment:

[P]utative recipients of speech usually have standing to challenge orders silencing would be speakers but ... plaintiffs still must show that the gag orders have caused them injury in fact and that their injury is

likely to be redressed by a favorable decision. Accordingly we held that third parties have standing to challenge a gag order only when there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so.

*Wecht,* 484 F.3d 194, 205 (internal citations and quotations omitted).

dressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."

*Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)); *accord Mariana v. Fisher,* 338 F.3d 189, 204–05 (3d Cir.2003). Put more simply, prudential standing "embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Newdow,* 542 U.S. at 11, 124 S.Ct. 2301 (internal quotation omitted).

■ In the First Amendment context, however, the Supreme Court "has enunciated other concerns that justify a lessening of prudential limitations on standing." *Sec'y of State of Maryland v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).[23] "[W]here the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and 'with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" *Id.* at 957, 104 S.Ct. 2839 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

## 2. Plaintiffs Have Standing.

■ Plaintiffs seek to establish constitutional standing on three grounds. First, the Candidate Plaintiffs allege that their First Amendment injury lies in their refusal to respond to the ACTION and PFI Questionnaires (*i.e.,* their refusal to engage in protected political speech), because of their fear of discipline under Canon 7B(1)(c). Second, Plaintiff PFI alleges that its First Amendment injury lies in its inability to receive the protected political speech of the Candidate Plaintiffs and other willing speakers, who declined to answer the PFI Questionnaire out of fear of discipline under Canon 7B(1)(c). Third, Plaintiff PFI alleges that it can derive constitutional standing from its refusal to publish the protected political speech of those candidates who fully answered the PFI Questionnaire, because the threat of discipline against the answering candidates has caused it to refrain from publishing their answers in order to protect them from discipline.

The court agrees that the Candidate Plaintiffs have established constitutional standing on the first ground, and that Plaintiff PFI has established constitutional standing on the second ground. In the alternative, however, if Plaintiff PFI cannot establish constitutional standing on the second ground, it can do so on the third ground.

---

**23.** The Supreme Court went on to summarize these concerns as follows:

Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Id.* at 956–57, 104 S.Ct. 2839.

Since both the Candidate Plaintiffs and Plaintiff PFI have constitutional standing, their facial overbreadth challenges to the pledges and promises clause and the commits clause of Canon 7B(1) (c) give them prudential standing. *See Joseph H. Munson*, 467 U.S. at 956–57, 104 S.Ct. 2839; *Taliaferro*, 458 F.3d at 188 ("Standing has constitutional and prudential components, both of which must be satisfied before a litigant may seek redress in the federal courts."); *see also Indiana Right to Life, Inc. v. Shepard*, 463 F.Supp.2d 879, 885 (N.D.Ind.2006);[24] *North Dakota Family Alliance, Inc. v. Bader*, 361 F.Supp.2d 1021, 1031–32 (D.N.D.2005); *Family Trust Found. of Kentucky, Inc. v. Wolnitzek*, 345 F.Supp.2d 672, 683–84 (E.D.Ky.2004).

### a. The Candidate Plaintiffs and the First Ground

The Candidate Plaintiffs have met their burden of establishing constitutional standing. In a letter dated April 6, 2007, the Candidate Plaintiffs signed a joint response to the ACTION Questionnaire that read, in pertinent part, as follows:

> [In response to questions] 1, 3–5: All of us, the Endorsed Republican Judicial candidates, pledge that, if elected, we will faithfully and impartially perform the duties of that office. Beyond that, Canon 7B(1)(c) of the Code of Judicial Conduct prohibits us from commenting on or making statements which appear to commit us with respect to the issues addressed in these questions.

Compl., Exhibit 4; *see also id.* ¶ 19. The Candidate Plaintiffs also allege that they received copies of the PFI Questionnaire but did not respond, because they believed that answering some of the questions—specifically questions 5, 6, 7, and 8—on the PFI Questionnaire would violate Canon 7B(1)(c). *Id.* ¶¶ 23, 30, 32, 34, 36.

The Candidate Plaintiffs' refusal to engage in protected political speech because of their fear of discipline under Canon 7B(1)(c) constitutes a cognizable "injury in fact" that is "(a) concrete and particularized, and (b) actual or imminent." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. Treating the allegations of the complaint as true, as the court must in ruling on Defendants' facial Rule 12(b)(1) motion, there is an adequate causal connection between the Candidate Plaintiffs' injury and Canon 7B(1)(c). *See Shepard*, 463 F.Supp.2d at 884 ("In a suit challenging the legality of government action, when the plaintiff is himself an object of the action at issue 'there is ordinarily little question that the action or inaction has caused him injury.' ") (quoting *Lujan*, 504 U.S. at 561–62, 112 S.Ct. 2130). Finally, the court finds that it is likely the Candidate Plaintiffs' injury will be redressed by a favorable decision in this case—*i.e.*, a declaratory judgment holding Canon 7B(1)(c) unconstitutional, either facially or as-applied to the ACTION or PFI Questionnaires. *See Kansas Judicial Watch v. Stout*, 440 F.Supp.2d 1209, 1220–21 (D.Kan.2006) (finding that the individual plaintiffs—a current candidate for judicial office and a prospective candidate—had constitutional standing).

### b. Plaintiff PFI and the Second Ground

Plaintiff PFI also has met its burden of establishing constitutional standing—on

---

**24.** Like the organizational plaintiff in *Shepard*, Plaintiff PFI "is seeking to protect its own First Amendment rights in pursuing this lawsuit and is not solely a 'third-party' plaintiff seeking to vindicate the rights of others. Furthermore, [Plaintiff PFI] is highly involved in judicial campaigns because of its desire and efforts to obtain information on the political and social views of judicial candidates. That relationship is sufficiently close to satisfy prudential standing requirements." 463 F.Supp.2d at 885.

the ground that it cannot receive the protected political speech of the Candidate Plaintiffs and other willing speakers, who declined to answer the PFI Questionnaire out of fear of discipline under Canon 7B(1)(c). The court's discussion above shows that the Candidate Plaintiffs declined to answer both Questionnaires out of fear of discipline under Canon 7B(1)(c), but were otherwise willing speakers. The Complaint reveals the same motive in the candidates who, in response to questions 5, 6, 7, or 8 of the PFI Questionnaire, circled the answer option "Decline to Respond Because of Judicial Canons*." [25] Recall that the star footnote for this answer choice contained the following explanation:

> By circling this phrase, I hereby attest that I would have replied to this question but for the prospect that I may be disciplined for announcing my views under Canon 7(B)(1)(c) of the Pennsylvania Code of Judicial Conduct, which states that judicial candidates may not "make pledges or promises of conduct in office" or "make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court," and that I may be disciplined for failure to disqualify myself as a judge in any proceeding concerning the issue raised in the question under Canon 3(C)(1), which states that judges must disqualify when their "impartiality might reasonably be questioned." I further attest that responding to this question would neither cause me to be biased for or against parties nor affect my ability to

be open-minded with regard to any issue.

Compl. ¶¶ 29, 31, 33, 35, Exhibit 6, at 1.

Since the Candidate Plaintiffs and the other candidates who "Decline[d] to Respond Because of Judicial Canons" are willing speakers, who are being restrained from speaking by the existence of Canon 7B(1)(c), Plaintiff PFI's inability to receive their protected political speech gives it constitutional standing under *Virginia State Bd. of Pharmacy* and *Wecht*.[26] *See Virginia State Bd. of Pharmacy*, 425 U.S. at 756, 96 S.Ct. 1817 ("[W]here a [willing] speaker exists ... the protection afforded is to the communication, to its source and to its recipients both."); *Wecht*, 484 F.3d 194, 202 ("[W]e [have] held that third parties have standing to challenge a gag order only when there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so."). In terms of the three-prong *Lujan* test, Plaintiff PFI's injury in fact is its inability to receive the willing speakers' protected speech. This injury is adequately causally related to the existence of Canon 7B(1)(c), which is deterring the willing speakers from engaging in protected speech. Finally, the court finds that it is likely that Plaintiff PFI's injury will be redressed by a favorable decision in this case—*i.e.*, a declaratory judgment holding Canon 7B(1)(c) unconstitutional, either facially or as-applied to the ACTION or PFI Questionnaires. *See Shepard*, 463 F.Supp.2d at 884; *Stout*, 440 F.Supp.2d at 1220–21; *Bader*, 361 F.Supp.2d at 1032–33; *Wolnitzek*, 345 F.Supp.2d at 684–87.

**25.** Seven candidates declined to answer question 5;· six declined to answer questions 6, 7, and 8. Compl. ¶¶ 29, 31, 33, 35.

**26.** The existence of these willing speakers distinguishes this case from *Pennsylvania Family*

*Institute v. Black*, No. 105CV2172, 2005 WL 2931825, at *5 (M.D.Pa. Nov. 4, 2005), which dismissed a similar suit for lack of standing, because the plaintiffs "fail[ed] to adduce sufficient evidence of a willing speaker."

### c. Plaintiff PFI and the Third Ground

■ In the alternative, Plaintiff PFI has met its burden of establishing constitutional standing—on the ground that the threat of discipline against the candidates who fully answered the PFI Questionnaire has caused it to refrain from publishing their answers (*i.e.*, their protected political speech) in order to protect them from discipline. According to the Complaint, one candidate answered question 5; two candidates answered question 6; two candidates answered question 7; and two candidates answered question 8. Compl. ¶¶ 29, 31, 33, 35. "However, PFI will not publish [these] responses, for fear that [the candidates] will be disciplined under the canons." *Id.*

"The restrictions of the challenged canon[ ] injure [Plaintiff PFI] . . . through its reluctance to publish the answers it received to its questionnaires for fear of causing the answering judges to be subject to discipline under the canons." *Shepard*, 463 F.Supp.2d at 884. Moreover, Plaintiff PFI "itself is a willing speaker," because it "wishes to publish the substantive responses it has already received." *Id.* Finally, this injury to Plaintiff PFI is redressable by a favorable decision, for if Plaintiff PFI were "to receive all of the relief [it] seek[s], [it] would be free to receive and distribute information contained in responses to [its] questionnaires without fear of subjecting the answering judges to discipline." *Id.* Plaintiff PFI therefore has constitutional standing on the ground that the threat of discipline against the candidates who fully answered the PFI Questionnaire has caused it to refrain from publishing their answers (*i.e.*, their protected political speech) in order to protect them from discipline.

## B. Ripeness

### 1. Ripeness Doctrine

"The existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief." *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir.2003) (quoting *Presbytery of New Jersey of Orthodox Presbyterian Church*, 40 F.3d 1454, 1462 (3d Cir. 1994)). "In some circumstances the ripeness requirement is drawn from Article III limitations on judicial power and in others from prudential limitations." *Id.* (quoting *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir.2001)). "The ripeness doctrine serves to determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Khodara Environmental, Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir.2004) (internal quotation omitted).

Significantly, however, "[a] First Amendment claim, particularly a facial challenge, is subject to a relaxed ripeness standard." *Peachlum*, 333 F.3d at 434. The *Peachlum* Court offered the following justification for relaxing the ripeness requirement in First Amendment cases:

> The courts have repeatedly shown solicitude for First Amendment claims because of a concern that, even in the absence of a fully concrete dispute, unconstitutional statutes or ordinances tend to chill protected expression among those who forbear speaking because of the law's very existence. This concern is particularly acute with regard to facial challenges to a statute or ordinance. ·

*Id.* at 434–35; *see also* 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3532.3 (2d ed. 1984) ("First Amend-

ment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss. In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.").

■ The Third Circuit's ripeness tests have been summarized as follows:

> In determining whether a case is ripe, we generally examine: (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration.

> In declaratory judgment cases, we apply a somewhat "refined" test because declaratory judgments are typically sought before a completed injury has occurred. Thus, when determining whether to engage in pre-enforcement review of a statute in a declaratory judgment action, we look to (1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment.

*Id.* (internal citations and quotations omitted); *see also Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Step–Saver Data Systems, Inc. v. Wyse Technology,* 912 F.2d 643, 646–47 (3d Cir.1990).[27]

### 2. Plaintiff's Claims Are Ripe for Adjudication.

#### a. The Adversity of the Parties' Interests

■ The first part of the ripeness test for declaratory judgment cases has been explained as follows: "[f]or there to be an actual controversy the defendant must be so situated that the parties have adverse legal interests." *Step–Saver,* 912 F.2d at 648 (internal quotation omitted). "Although the party seeking review need not have suffered a completed harm to establish adversity of interest, it is necessary that there be a substantial threat of real harm and that the threat must remain real and immediate throughout the course of the litigation." *Presbytery of New Jersey,* 40 F.3d at 1463 (internal citations and quotations omitted).

*Presbytery of New Jersey* is the key precedent here. In that case, the Third Circuit held that the plaintiff pastor's First Amendment challenge to New Jersey's Law Against Discrimination ("LAD") satisfied the first part of the ripeness test for declaratory judgments where the State had not enforced, and promised never to enforce, the LAD against religious institutions and individuals acting in an institutional capacity, but failed to promise not to enforce the LAD against individuals acting outside of an institutional capacity. 40

---

**27.** In reconciling these two tests, the Third Circuit has observed that:

> The *Step–Saver* rubric is a distillation of the factors most relevant to the *Abbott Labs* consideration. Adversity and conclusiveness apparently are subsumed under the "fitness" prong of the *Abbott Labs* test, while utility is relevant to both "fitness and hardship." Our cases have fit the factors relevant in the *Abbott Labs* framework into the *Step–Saver* headings, as follows:
> ADVERSITY:
> — Whether the claim involves uncertain and contingent events, or presents a real and substantial threat of harm.

> CONCLUSIVENESS:
> — Whether the issues are purely legal (as against factual).
> — Whether further factual development would be useful.
> UTILITY:
> — Hardship to the parties of withholding decision.
> — Whether the claim involves uncertain and contingent events.
> Of course there may be other factors considered in a ripeness analysis.

*NE Hub Partners,* 239 F.3d at 342 n. 9.

F.3d at 1464–68. The *Presbytery* Court found that the plaintiff pastor could be prosecuted notwithstanding the State's promise, because he had alleged an intent to violate the LAD outside of his institutional capacity. *Id.* Construing the complaint in the light most favorable to the non-moving plaintiff pastor, the Court therefore concluded that his First Amendment claims had been improperly dismissed for lack of ripeness. *Id.*[28]

For similar reasons, Plaintiffs in this action satisfy the first part of the ripeness test for declaratory judgments. Defendants correctly note in their motion to dismiss that the pledges and promises and commits clauses of Canon 7B(1)(c) have never been enforced against a judge or judicial candidate in Pennsylvania. *See* Motion to Dismiss ¶ 7. That by itself, however, does not make Plaintiffs' action unripe. Rather, like the plaintiff pastor in *Presbytery,* Plaintiffs want to speak in a way that violates the law, but their speech is being chilled by the ongoing prospect of discipline that Defendants have not disavowed. Indeed, considering the facial nature of Defendants' attack on the court's subject matter jurisdiction, it would be improper for the court to consider, at this stage, any promise by Defendants not to enforce the pledges and promises and commits clauses against Plaintiffs' proposed speech. The court therefore holds that, at this stage of Plaintiffs' action, the parties have adverse legal interests, and that Plaintiffs face a substantial, immediate threat of real harm from Defendants if they were to speak as they propose to in the Complaint. Moreover, the court finds this conclusion consistent with the Third Circuit's relaxed ripeness standard for First Amendment cases. *See Peachlum,* 333 F.3d at 434.[29]

**28.** This aspect of *Presbytery* appears to be consistent with *Salvation Army v. Dep't of Community Affairs of State of New Jersey,* 919 F.2d 183 (3d Cir.1990). Although *Salvation Army* involved a pre-enforcement request for a declaratory judgment under the First Amendment, it did not employ the three-part test articulated in *Step–Saver Data Systems, Inc. v. Wyse Technology,* 912 F.2d 643, 646–47 (3d Cir.1990). Nevertheless, the following summary of the Court's justiciability holding seems consistent with the Third Circuit's approach in *Presbytery*:

> In sum, we conclude that the defendants' assurance that the state will not enforce various statutory provisions against [The Salvation Army ("TSA")] suffices to remove those provisions from the scope of the current controversy. Since TSA does not dispute the efficacy of the defendants' waivers of regulatory provisions, the remaining justiciable controversy consists only of TSA's objections to the statutory and regulatory provisions the defendants have refused to waive.

*Salvation Army,* 919 F.2d at 193–94.

**29.** Although not necessary to support the court's holding on the first part of the ripeness test, the court believes the following facts alleged in the Complaint and contained in the attached exhibits bolster its holding. First, the Honorable Anne E. Lazarus, the current chair of the Ethics Committee of the Pennsylvania Conference of State Trial Judges, refused to answer the PFI Questionnaire, and in an April 19, 2007 letter explaining her refusal wrote:

> Unfortunately, as a sitting judge and a candidate for the Superior Court, I feel it would be inappropriate for me to opine on many of the specifics about which you ask. As a judge, I must review each case independently and I believe that by answering a questionnaire I am forced to take sides, blurring my view of justice.

Compl. Exhibit 7, at 2. The provision of the Pennsylvania Code of Judicial Conduct entitled "Reliance on Advisory Opinions" reads as follows:

> The Ethics Committee of the Pennsylvania Conference of State Trial Judges is designated as *the approved body to render advisory opinions regarding ethical concerns involving judges, justices and other judicial officers subject to the Code of Judicial Conduct,* and, although such opinions are not per se binding upon the Judicial Conduct Board, the Court of Judicial Discipline or

### b. The Conclusiveness of the Judgment

█ Regarding the second part of the ripeness test for declaratory judgment cases, the *Step–Saver* Court explained that "[a]ny contest must be based on a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Step–Saver*, 912 F.2d at 649 (internal quotation omitted). Yet "the need for a concrete set of facts is greater in some instances than others." *Presbytery of New Jersey*, 40 F.3d at 1463. For example, "an actual factual setting is particularly important in cases raising allegations of an unconstitutional taking, whereas facts are not so important where the question is predominantly legal." *Id.* at 1463–64 (internal citations and quotations omitted).

In addition to these principles, the *Presbytery* Court weighed the following factors in its conclusiveness analysis: (1) whether "the parties' claims would . . . substantially change in future litigation; (2) whether 'the current parties [are] appropriate to raise the issues at bar'; and (3) whether "the parties would be subject to enforcement of the challenged act" if it were implemented. *Id.* at 1468.

the Supreme Court of Pennsylvania, action taken in reliance thereupon and pursuant thereto shall be taken into account in determining whether discipline should be recommended or imposed.

PA.CODE OF JUD CONDUCT, *Reliance on Advisory Opinions* (2007) (emphasis added). Although Judge Lazarus obviously was not speaking for the Ethics Committee or issuing an advisory opinion, the court finds her words illuminating, especially given the lack of guidance, whether in the form of case law or advisory opinions, on the scope of the pledges and promises and commits clauses of Canon 7B(1)(c), and the Ethics Committee's failure to issue any such guidance.

According to the Complaint, on April 12, 2007, Candidate Plaintiff Donald R. Totaro sent a letter to the Judicial Ethics Committee of the Pennsylvania Conference of State Trial Judges—the committee chaired by Judge Lazarus—asking whether he was prohibited by Canon 7B(1)(c) from answering the ACTION Questionnaire, Compl. ¶ 20, and in a letter dated April 13, 2007, the Judicial Ethics Committee responded that it was not authorized to advise whether judicial candidates could respond to the ACTION Questionnaire. *Id.*

Candidate Plaintiff Totaro is not the only person whose wish for an advisory opinion has gone ungranted. In a letter dated April 11, 2007, M. Lucile Longo, Esq. declined to answer the PFI Questionnaire, because she believed "that doing so would violate the Pennsylvania Code of Judicial Conduct, or its spirit." *Id.* Exhibit 7, at 1. Ms. Longo added that "[a]dditionally, I have sought an advisory opinion from the Pennsylvania Conference of State Trial Judges, Ethics Committee and do not anticipate receiving that opinion prior to your deadline. I have been advised the process takes approximately thirty days." *Id.* Defendants' Motion to Dismiss does not mention any advisory opinion addressing the pledges and promises or commits clauses of Canon 7B(1)(c), so the court must assume no such opinions exist.

As emphasized earlier, the court has not articulated these observations regarding the factual allegations in the Complaint and its exhibits to support its holding that Plaintiffs, at this stage of their action, satisfy the first part—the adversity of interest part—of the ripeness test for declaratory judgments, and they do not constitute an improper consideration of facts outside the Complaint in ruling on Defendants' facial challenge to the court's subject matter jurisdiction. The court does, however, think that they bolster its conclusion that the parties have adverse legal interests, and that Plaintiffs face a substantial, immediate threat of real harm from Defendants if they were to speak as they propose to in the Complaint, especially since the court in *Pennsylvania Family Institute v. Black*, No. 105CV2172, 2005 WL 2931825, at *5 (M.D.Pa. Nov. 4, 2005), dismissed a similar case for lack of ripeness where the record was "devoid of any interpretation of the judicial canons by Pennsylvania's courts, the Pennsylvania Judicial Conduct Board, or the Pennsylvania Office of Disciplinary Counsel." 2005 WL 2931825, at *7.

Plaintiffs' action satisfies this second part of the ripeness test for declaratory judgments for several reasons. First, Plaintiffs have assembled an extensive factual record that includes much of the speech that allegedly has been chilled by the pledges and promises and commits clauses of Canon 7B(1)(c), and that may even give the court enough information to render a ruling on the constitutionality of those clauses as applied to the ACTION and PFI Questionnaires. (Like the *Presbytery* Court, this court finds it "hard to see how a more concrete financial situation would aid resolution of the plaintiffs' First Amendment free speech challenge to the statute," as "[s]uch factual development is of minimal assistance in facial challenges such as this." *Id.* at 1469.) Second, although the factual record assembled by Plaintiffs in the exhibits to the Complaint aids the court a great deal, the First Amendment issues in this case are "predominantly legal," which means Plaintiffs can satisfy the requirements of this second part of the ripeness test with a less concrete factual record than would normally be required. *Id.* at 1468 (finding that a facial First Amendment challenge to a statute involved "largely legal issues").

Lastly, with regard to the additional factors mentioned above, the court finds (1) that the parties' claims would not substantially change in future litigation;[30] (2) that the current parties are eminently appropriate to raise the issues at bar; and (3) that the current parties would be subject to enforcement of the challenged Canon if it is not invalidated or its enforcement not enjoined. The court therefore finds that this action presents "a real and substantial controversy admitting of specific relief through a decree of a conclusive character," *Step–Saver*, 912 F.2d at 649, since the

injunctive and declaratory relief Plaintiffs seek should resolve their First Amendment concerns.

### c. The Utility of the Judgment

■ Lastly, with regard to the third part of the ripeness test for declaratory judgment cases, the *Step–Saver* Court remarked that "a case should not be considered justiciable unless the court is convinced that [by its action] a useful purpose will be served." *Step–Saver*, 912 F.2d at 649 (quoting E. BORCHARD, DECLARATORY JUDGMENTS 29, 58 (1941)). The usefulness of declaratory judgments was colorfully expounded in debate by Congressman Gilbert, whose remarks were quoted in *Step–Saver*: "[u]nder the present [pre-Declaratory Judgment Act] law, you take a step in the dark and then turn on the light to see if you stepped into a hole. Under the declaratory judgment law you turn on the light and then take the step." *Id.* at 649–50 (quoting 69 Cong. Rec. 2108 (1928)).

It is clear that a useful purpose will be served by the court's adjudication of this case. If the court grants Plaintiffs the declaratory and injunctive relief they seek, Plaintiffs will be able "to speak without fear of governmental sanction"; on the other hand, if the court denies Plaintiffs' requested relief, Plaintiffs will know the limits of their rights. *Presbytery of New Jersey*, 40 F.3d at 1470. In reaching the same conclusion, the *Presbytery* Court put it well when it wrote that "[c]urrent First Amendment jurisprudence does not require a Thoreau or a Gandhi who is willing to go to jail for his beliefs but permits the more cautious Emersons among us to assert our fears of interference with our fundamental rights in the civilized atmosphere of a court before subjecting ourselves to the risk of arrest or jail." *Id.* n.

---

**30.** As a reading of *Pennsylvania Family Institute v. Black*, No. 105CV2172, 2005 WL 2931825 (M.D.Pa. Nov. 4, 2005) reveals, this action closely resembles *Black*.

13. This case does not involve the prospect of criminal prosecutions, but the point remains the same. The court finds that the third part of the ripeness test for declaratory judgments weighs in favor of the conclusion that Plaintiffs' claims are ripe for adjudication.

In light of the court's findings with regard to the three-part ripeness test for declaratory judgments, the court concludes that the issues presented by Plaintiffs' claims are fit for judicial consideration and that the parties will experience significant hardship if the court withholds consideration of their claims. The court therefore holds that Plaintiffs' claims are ripe for adjudication.

## IV. Conclusion

For the foregoing reasons, the court concludes that Plaintiffs have standing, and that Plaintiffs' claims are ripe. The court therefore will deny Defendants' motion to dismiss for lack of subject matter jurisdiction.

An appropriate Order follows.

### *ORDER*

**AND NOW,** this 14th day of May, 2007, upon consideration of Defendants' Motion to Dismiss (Document No. 7), it is hereby **ORDERED** that said motion is **DENIED.**